# CHARLESTON.

HOOPER *et al. v.* HOOPER'S EX'RS *et al.*

. Submitted September 8, 1886—Decided November 25, 1886.

*(WOODS, JUDGE, absent.)

1. COMMISSIONER'S REPORT—APPEAL.

: A decree, which sustains certain exceptions to a commissioner's report and re-commits the cause to the same or another commissioner, is not appealable.   (p. 283.)

2. COMMISSIONER'S REPORT—EXCEPTIONS.

Items or matters excepted to in a report of a commissioner, which by the court is re-committed, will not be open to judicial investigation in acting upon the report made upon such re-commitment, unless such items or matters are excepted to in the latter report.   (p. 283.)

3. EXECUTORS—WILLS—APPRAISEMENT BILL.

Executors are to be charged with the items in the appraisement bill, unless they can show, that the property did not belong to the testator at the time of his death, or in some other way account for the disposition of such items.   (p. 284.)

4. EXECUTORS—WILLS—PERSONAL PROPERTY OF TESTATOR—BUSINESS OF TESTATOR.

The executors are to be charged with the personal property owned by the testator at the time of his death, which came or ought to have come into their hands; and they will not be permitted to carry on the business, in which the testator was engaged at the time of his death, and charge the estate with any loss occasioned thereby, or to mix up the accounts of such business with their executorial accounts.   (p. 284.)

5. EXECUTORS—WILLS—CASH—APPRAISEMENT.

Executors must be charged with the cash in the testator's safe

*Counsel below.

at the time of his death, which came into their hands, and will not be allowed to rely on the appraisement for such items, which is much less than the cash actually received.  (p. 284.)

6. APPRAISEMENT—WILLS—EVIDENCE.

An appraisement of property in Maryland by appraisers appointed in West Virginia, where the will was admitted to probate, will not be *prima facie* evidence of the amount and value of such property.  (p. 288.)

7. EXECUTORS—WILLS—SURETIES.

Where a testator in West Virginia in his will required his executors to sell all his personal property, " wherever situated, " and a tract of land owned by him in Illinois and dispose of the proceeds, as directed in the will, and the testator had large personal property in Maryland, and there were no letters of administration issued in that State nor in the State of Illinois, and the executors took charge of the property in Maryland and disposed of it by selling a portion there and bringing the residue into West Virginia and disposing of it here, and sold the Illinois land and received the proceeds, they and their sureties will in West Virginia be required to account for such property and proceeds.  (p. 296.)

8. EXECUTORS—WILLS—PRINCIPAL AND SURETY.

Where executors execute a joint bond, they stand as to each other in the relation of principal and surety, each as principal *quoad* his own acts and as surety *quoad* the acts of the other.  (p. 299.)

*Martin & Woods* for appellants.

*J. W. Mason* and *A. F. Haymond* for appellees.

JOHNSON, PRESIDENT:

This is a suit in chancery instituted in the Circuit Court of Taylor county and removed to Marion county, the object of which was to surcharge and falsify the accounts of Charles E. Hooper and W. S. Hooper, the executors of the will of John W. Hooper, deceased, and to settle the said accounts and, the executors being insolvent, to obtain a decree against the sureties on the bond of the executors for the ·*devastavit* of the executors.   There had been three *ex parte* settlements made.   The bill charged, that many of the credits therein allowed, specifically setting them out, were improperly allowed, and quite a large amount of property, specifically desribing it, had not been charged to them.   Among other things the bill alleged, that the testator had rented a hotel

in Cumberland, Maryland, called the "Revere House," which he had furnished at large expense, and which he had put in charge of his son, Charles E. Hooper, to be kept by him ; and that the executors were liable to account for that property to a much larger degree than they had accounted.

The answer of Charles E. Hooper averred, that the Revere House did not belong exclusively to the testator; that only one half thereof belonged to him ;—that about May, 1870, the testator and his son, the respondent, commenced operating said house as equal partners;—that the house belonged to one Michael ———, from whom it was leased ;—that "it was furnished by respondent and testator, respondent paying for some things, testator paying for some, and other things being paid for out of the proceeds of the business ;—that said business was carried on in the name of J. W. & C. E. Hooper ; and that all property there belonged to them equally."

I do not pretend to set out all the different allegations and charges of the bill. It exhibits the will of J. W. Hooper, in the first clause of which he provided, that all his " personal property, wherever situated, together with a tract or parcel of land now owned by me and situate in the State of Illinois be sold either at public auction or private sale under the direction of my wife, Sarah ; and the proceeds thereof I will and bequeath one third to my beloved wife, Sarah, and the remaining two thirds to be divided equally among my children." He left Sarah, his widow, and Charles E. and W. S. Hooper, the executors, and Rose P. and Harry B. Hooper, his children. The bill was filed by Harry B. Hooper and his sister Rose P. Sullivan against the said Charles E. and W. S. Hooper in their own right and as executors and their sureties John Doonan, George Brinkman and Granvill E. Jarvis on their executorial bond, and also Sarah Hooper and G. L. B. Fetterman and ———————. The original bill alleges, that a new bond was executed on the 6th day of June, 1873, by the parties to the original bond, except G. E. Jarvis, William A. Turner executing in his stead ; that Turner is dead ; and plaintiffs insist, that the only effect of said Turner's bond was to give additional security, and that the obligors in the original bond were not nor were any of them relieved by the giving of the new bond. Turner's administrator was made

a defendant and answered the bill alleging the insolvency of
Turner at the time of his death.   The executors answered ad-
mitting many of the allegations of the bill and denying
others.   All the defendants except Brinkman answered the
bill.   Before any depositions were taken the cause by con-
sent of the parties was referred to one of the commissioners
of the court " to audit, state and settle the executorial ac-
counts of C. E. Hooper and W. S. Hooper, and to
ascertain and report what debts, if any, are still out-
standing and due from said testator; and what personal
estate of said testator came into the hands of said executors
to be administered, and what disposition they have made of
the same, to ascertain and report the value of said Illinois
land at the time of said testator's death, and whether the
same has ever been sold and, if it has, to whom, and what
disposition has been made of the proceeds of the sale thereof,
together with any other matters deemed pertinent by him-
self, or that is required by any of the parties."

M. H. Dent, commissioner, made the report, by which he
ascertained, that the executors were indebted to the estate
in the sum of $2,015.74.

To this report the plaintiffs filed twenty-four exceptions;
and the defendant Sarah Cooper filed three exceptions.
Many depositions were taken before commissioner Dent,
which are returned with his report.   The court sustained
seventeen of the plaintiffs' exceptions and did not pass
upon the other exceptions and referred the cause to commis-
sioner Z. M. Cochran to audit, re-state and settle the execu-
torial accounts according to the requirements of the former
decree of reference with leave to the parties to re-examine
any of the parties, whose depositions had been taken upon
matters, upon which they had not before testified.   Cochran
made his report, that the executors were indebted to the
estate in the sum of $4,509.70.

To this report the plaintiffs and defendant Sarah Hooper
filed fifteen exceptions; and Sarah Hooper alone filed one,
W. S. Hooper and Whitescarver, his assignee, filed four, and
the defendants Brinkman and Doonán eleven.

On the 6th of August, 1884, the court by its decree sus-
tained some of the exceptions and overruled others and

again referred the cause to another commissioner, W.
R. D. Dent, to re-state the accounts of said executors
according to the provisions of the original decree of
reference and of the decree then pronounced. W. R.
D. Dent reported the said executors indebted to the es-
tate in the sum of $9,130.32. He also reported, that of the
assets Charles E. Hooper received $10,748.41 and W. S.
Hooper $4,430.43, and says :—"It .is impossible to make a
statement of the disbursements of each, as the receipts are
in the joint names of C. E. & W. S. Hooper, executors; and
your commissioner from all the evidence in the cause is of
the opinion, that both of them are jointly liable, and neither
entitled to any distributive share in said estate, and as the
proof shows, that they are both insolvent, he therefore does
not even guess at a settlement between them, as the best
settlement from data in this cause would be a mere conjec-
ture. As to the Revere House property the commissioner
reports, that "from the pleadings and evidence in the cause
he is of the opinion, that John W. Hooper, deceased, in April,
1870, opened a hotel in Cumberland, Maryland, and placed
his son, Charles E. Hooper, in charge with the understand-
ing and agreement, that they would divide the profits, in-
other words, placing his capital against his son's labor. Then
follows a settlement of the assets and liabilities at the date
of the decedent's death," that came into the hands of said
Charles E. Hooper as surviving partner, to wit:

| | | |
|---|---|---|
| To assets sold at Cumberland .......... .......... .......... .......... .......... ......... | $1,879 | 76 |
| " appraised value of property not in sale-bill...... ....... ....... | 1,313 | 63 |
| " am't collected from B. & O. R. R. Co...... ...... ...... ......... | 1,343 | 88 |
| | $4,539 | 27· |

By the following debts paid, that were owing by said house
Dec. 6, 1871, the date of the testator's death, which are
specified and amounted to......... ......... ......... ......... ......... $1,845 30

Leaving a balance, which the commissioner charges to the
executors, of......... ......... ...... ...... ......... ...... ...... ...... $2,793 97

As to said Revere House property the commissioner at the
instance of Charles E. Hooper reported, that said John W.
Hooper in his lifetime had leased said property for the term
of three years from the 1st day of April, 1870, and had ex-

ecuted his notes in payment of said lease; that Charles E.
Hooper claims in his answer, that he could not dispose of
said hotel at the date of his father's death without great loss,
and that said estate would have had to pay the rent of said
property for the term of said lease, and that for the interest
of all parties concerned he carried on said hotel until
August, 1872, when he made arrangements with said lessor,
by which he cancelled said lease; that he kept a strict ac-
count of the receipts and disbursements of said hotel, and
that the account stands as follows:

Total assets of Revere House including receipts from Dec.
   18, 1871, to Aug. 1, 1872, as per Exhibit "A."........ ....... $13,723 02
Total disbursements at said house for debts contracted both
   before and after the death of John W. Hooper, deceased,
   as per Exhibit "B"........ .......... ......... ........... ........... ...... 13,499 67

Am't due John W. Hooper's estate .........------ ...... ...... ...... $223 35

"On that he should at least be credited with the amount of
two notes paid by him to ——————— for rent of the Revere
House from ——————— to August, 1872, which amount should
be deducted from the amount of assets heretofore charged to
the executors as coming from said house as follows:

Net amount ..... ......... ....... ....... ......................................... $2,693 67
Less am't of said two notes given by John W. Hooper for
   rent accruing after his death .... ...... ......... ..... ..... ...... 915 00

                                                  $1,778 67

    I do not pretend to give all the items of the commissioner's
report. He says:—"No testimony not in writing was taken
or heard before your commissioner; but the following deposi-
tions and other writings were read and are now here made a
part of this report: William S. Hooper, Sarah Hooper,
Harry B. Hooper, Rose P. Sullivan, Charles E. Hooper,
Isaac N. Grimes, Thomas Smouse, John M. Rogers, A.
D. Casteel, John W. Hamilton, M. Treiber's letter, former
commissioner's report, the pleadings and exhibits filed
therewith, and no other evidence was heard or consid-
ered by your commissioner."

    To this report the plaintiff and Sarah Hooper filed five ex-
ceptions, Sarah Hooper alone four, W. S. Hooper and Whites-
carver filed eight exceptions, the defendants, Brinkman,
36

Doonan and the administrator of Charles E. Hooper, who died pending the suit, which was revived against Isaac N. Grimes, his administrator, filed nine exceptions. Defendant Jarvis excepted to the report, because it was based on incompetent evidence; and defendant Grimes excepted, because his intestate was not given credit for the two notes given by John W. Hooper for rent of Revere House. On the 12th day of March, 1886, the cause was again heard, and the exceptions of the plaintiff and Sarah Hooper were overruled; W. S. Hooper's and Whitescarver's exceptions were overruled and so much of the exceptions of Brinkman, Doonan, Grimes, administrator, and Jarvis, as refer to the item of $1,508.18, property appraised and not sold, and the item of $33.70 of B. & O. R. R. money, and so much, as refers to not charging the plaintiff with board, and so much, as refers to not allowing Charles E. Hooper credit for expenses and rent after his father's death in settling up the Revere House business be overruled. It sustained the exception as to $1,400.00 cash on hand "at the time of appraisement" to the extent of $417.01, and overruled it to the extent of $982.99, the amount of cash appraised. It overruled the exception to the items of $2,693.67, appraised value of Revere House property, as to $223.35, but sustained it as to $2,470.32 of said charge. It sustained the exception to the item of $758.12 proceeds of the sale of the Illinois land. It overruled the exception of defendants, that the amount of the two notes for rent of Revere House was not allowed as a credit to the executors. The court sustained the exception of the plaintiff to such parts of the deposition of Charles E. Hooper as to any communication with his father as to the Hamilton debt, also as to any contract between C. E. Hooper and his father as to the Revere House and as to certain payments, which C. E. Hooper testified to having made to his father. In all other respects the report was confirmed.

Then the court proceeds to make the reduction consequent on sustaining certain exceptions and ascertains the indebtedness of the executors to the estate as of the 1st day of January, 1873, to be $5,484.87 and then decrees one sixth of said sum with interest to Harry B. Hooper and one sixth of said sum less $676.22 charged to her in said report with inter-

est to Rose P. Sullivan, and adjudged, ordered and decreed, that these sums should be paid to the plaintiffs by the said W. S. Hooper, George Brinkman, John Doonan, Granville E. Jarvis and Isaac N. Grimes, administrator of Charles E. Hooper, out of the assets, &c., and gives the plaintiffs' costs and does not dispose of the residue of the sum.

From this decree the plaintiffs and Sarah Hooper appealed.

This is an appealable decree, because it settles the principles of the cause and orders money to be paid. It may be likened to the confirmation of a commissioner's report in a creditors' suit and an order of sale leaving the distribution of the money among those entitled to it to a future decree.

It is argued by counsel for appellants, that the exceptions made to commissioner M. H. Dent's report and sustained by the decree, that passed upon them, as finally settled in the cause, as that, he contends, is an appealable decree, and its review is barred by the limitation of two years. It was not an appealable decree, because it did not settle all the principles of the cause. (*Hill* v. *Als,* 27 W. Va. 215; *Shirey* v. *Musyrave, supra* 131; *Laidley* v. *Kline,* 21 W. Va. 21).

That decree was interlocutory, as it re-committed the report and directed a new account and new evidence to be heard. We are asked to consider exceptions to a commissioner's report, which has been set aside. We can consider no exceptions here except to the last report made, which was confirmed by the court. Items or matters excepted to in a report, which by the court is re-committed, will not be open to judicial investigation in acting upon the report made upon such re-commitment, unless such items or matters are excepted to in the latter report. (*Carskadon* v. *Minke,* 26 W. Va. 729). Therefore we can look only at the exceptions to the last report, which we will now proceed to do, considering first the exceptions of the appellees.

Their first exception is, that the executors are charged with $1,508.18, property in the appraisement-bill and not in the sale-bill of property at the Grafton Hotel. This exception the court properly overruled. At the time the testator

died, he was keeping the Grafton House. The proof shows, that for some time, more than a year, after the death of the testator the Grafton House was carried on by the executors, as they claimed, with the consent of the widow, and that the personal property not sold was used in carrying on said hotel. There is no sufficient proof of such arrangement between the widow and the executors; and if there were, the arrangement would not be binding on the estate. The property of a testator at his death in his possession is that, for which the executors must account; and they have no legal right to carry on the business of the testator after his death and charge the estate for any losses occasioned thereby.

Their next exception to the report is, that it charges the executors with $1,400.00 cash on hand at the time of the testator's death. The proof shows clearly to my mind, that there was at least that amount of cash belonging to the testator in his safe at the time of his death. W. S. Hooper, one of the executors, testified to this, and that he received it and sent about half of it to his brother at Cumberland. The other executor, C. E. Hooper, says in his deposition:— "I have no accurate means of knowing what cash was on hand at the time of my father's death; but I know, that about the latter part of November, I sent to W. S. Hooper for my father $500.00 from Cumberland, with which to pay off servant's hire and other bills coming due about the 1st of December."—He also says:—"I think most of the sum of $982.99 appraised as cash was taken in after my father's death up to the time of the appraisement."—The testator died December 6th, 1871. The bond was executed December 20, 1871; and the bill alleges, that the property was appraised soon after. It would be strange, if the house were so hard pushed the last of November, as to require C. E. Hooper to send $500.00 to pay servants' hire, &c., yet within a month after there should be $982.99 cash on hand. I have no doubt W. S. Hooper's evidence as to this matter is true, and that there was $1,400.00 cash on hand at the time of the testator's death. The court sustained this exception as to the excess over $982.99 and took the appraisement as correct instead of the actual amount of cash on hand at the testator's death. Of course the executors were responsible

for the actual amount of the cash on hand. The court erred in not overruling this exception *in toto.*

Their next exception to the report is, that the executors are charged with $33.90 as money collected from the B. & O. R. R. Co. This item the executors have charged against themselves in their first settlement. It is *prima facie* correct, and it is not shown in the record to be incorrect. This exception was properly overruled.

Their fourth and ninth exceptions will be considered together—No. 4 is to charging the executors with $2,693.67 appraised value of Revere House property. They deny the right to charge anything on account of the Revere House. Exception No. 9 is—" because the report does not allow C. E. Hooper credit for expenses, rent, &c., after the death of his father in settling up the partnership affairs in the Revere House in Cumberland; that Charles E. Hooper and his father were partners at Cumberland engaged in the hotel business. After the death of his father Charles took possession of his property there as surviving partner not as executor; and his sureties on his executorial bond are not liable for anything lost by him as surviving member of the firm. Their liability begins, if at all, when the property was or should have been passed to himself as executor; and the said sureties are not liable for any losses incurred by the surviving partner. "—The counsel for appellees insist, that, if the personal property at the said Revere House was partnership property of the testator and Charles E. Hooper, it was liable for their partnership debts; and that upon the death of the testator all the property and responsibilities of the partnership devolved upon the surviving partner Charles E. Hooper, and the legal title to such property was in him, and as such surviving partner he was entitled to the possession thereof and had the right to sue for and recover the same and to sell and dispose of the same for the payment of the partnership debts. To sustain these propositions they cite Coll. Part. secs. 129, 130; *Jones* v. *Hardesty*, 10 Gill & J. 404 (32 Am. Dec. 180); *Kinsloe* v. *McCouts*, 4 Rich. L. 46 (53 Am. Dec. 711); *Andrews* v. *Brown*, 21 Ala. 437 (56 Am. Dec. 252).

These propositions are sustained by the authorities cited,

the true rule being laid down in the last case as follows:—
When a partnership is dissolved by the death of one or more
partners, the legal title to all the personal property and
choses in action belonging to the firm become vested in the
survivors exclusively for the purpose of paying the debts
and then dividing the net balance among those entitled
thereto, giving to the representatives of the deceased partner
the same interest, he would have taken, had he been in life,
and the firm had been dissolved by mutual consent. It is
also insisted by the counsel, that, where the surviving partner
is also the personal representative of the deceased partner,
the partnership effects come into his hands as surviving
partner, not as personal representative; and they cite *Pear-
son* v. *Reedy,* 6 B. Mon. 128 (43 Am. Dec. 160), which holds,
that partnership funds coming into the hands of a surviving
partner, who has been appointed administrator of the de-
ceased partner, come to him as survivor, not as adminis-
trator.

The counsel then insist, that, if these two propositions are
true, it necessarily follows, that, if the surviving partner,
while the property is in his hands as such, appropriates and
wastes it, he is not liable for the value of the same as execu-
tor, and that his sureties as executor can not be and ought
not to be made or held liable for the value thereof. It seems
to me that this is clearly a *non sequitur.* If the surviving
partner is authorized to hold as such the partnership prop-
erty for the purpose of paying the partnership debts and to
pay over to the personal representative of the deceased part-
ner his share of the balance, and he squanders and wastes
the partnership estate, ought he not in justice to account for
such share, as should have come into his hands as executor?
And why should not his sureties on his bond as executor be
held liable for the property, which should have come into
his hands? The authorities cited do not hold, that such
sureties would not be held liable in such a case. The gen-
eral rule certainly is, that sureties on the bond of an execu-
tor will be held liable for all the estate of the testator, which
did or should have come into the hands of the executor.

But does the record show, that C. E. Hooper was the part-
ner of his father in the Revere House property? This ques-

tion is raised by the defendants' exception. The bill alleges, that the Revere House property belonged to the testator, John W. Hooper. Charles E. Hooper in his answer says:— "It is not true, that said Revere House property belonged exclusively to said testator; only one half part belonged to said testator. About the month of May, 1870, respondent and said testator commenced operating said house as equal partners. The house belonged to and was leased from Michael. It was furnished by respondent and said testator, respondent paying for some things, and testator paying for some, and others being paid for out of the proceeds of the business. Said business was carried on in the name of J. W. & C. E. Hooper, and all the property there belonged to them equally"

To this answer there was a general replication. Of course no evidence of C. E. Hooper with regard to any contract or other transaction had personally with the deceased is competent, as has been many times held by this Court; and its incompetency will be taken advantage of in this Court, though no exception was taken to it in the Circuit Court. But the testimony of the witness as to a contract with his father was excepted to, at the time it was taken, and the exception was sustained in the last decree made in the cause. W. S. Hooper, the other executor, in his deposition says, that his father rented the Revere House and furnished it at a cost of not less than $6,000.00. He says his brother contributed neither money nor supplies, except that he furnished his own rooms. He and his family occupied three rooms. Harry B. Hooper in his deposition says his brother Charles told him, that his father furnished the Revere House, and also told him, that he, Charles, was to receive one third of the profits. This is about all the evidence on the subject.

Commissioner W. R. D. Dent in his report says:—"From the pleadings and evidence in this case your commissioner is of the opinion, that John W. Hooper, deceased, in April, 1870, opened a hotel in Cumberland, Maryland, and placed his son, Charles E. Hooper, in charge with the understanding and agreement, that they would divide the profits, in other words placing his capital against his son's labor."—

There is no proof of a partnership; but, as it appears, that Charles E. Hooper went on with the business at Cumberland until August, 1872, and in his accounts has mixed his own indebtedness so incurred, the account will as to that matter have to be re-taken. The executors are charged with the amount of the appraisement of the property at the Revere House. It is not usual for appraisers under our laws to go into another State to perform their duties; and if they should, an appraisement so made would not be even *prima facie* correct, as it would have been made without legal authority, though they would be good witnesses to prove the amount of the property, which went into the hands of the executor.

It is also insisted by counsel for appellees, that, if the personal property at the Revere House was not partnership property but belonged exclusively to the testator at the time of his death, the executors named in the will by their qualification as such in Taylor county did not acquire any jurisdiction over said property, or any right thereto, or incur any liability or responsibility therefor, even though one or both of said executors after the death of the testator took possession thereof in Cumberland, Maryland, and then sold the same and brought part of the same into West Virginia and sold it; that said executors by virtue of their qualification as such in West Virginia had no legal right to enter the State of Maryland and take possession of said property and sell or dispose of it either in Maryland or West Virginia, and if they or either of them did so, they did not thereby become liable for such property or its value as the executors of said will but only as executors *de son tort;* and that in no event can their sureties on their bond executed in Taylor county, West Virginia, the place of their qualification, be held liable for said property. For this they cite *Dickinson* v. *McCraw,* 4 Rand. 158; *Morrell* v. *Dickey,* 1 Johns. Ch'y 153; *Doolittle* v. *Lewis,* 7 Johns. Ch'y 45; *Goodwin* v. *Jones,* 3 Mass. 514; *Davis* v. *Esty,* 8 Pick. 475; *Dawes* v. *Head,* 3 Pick. 128; *McRae* v. *McRae,* 11 La. Am. 571; *Selectmen* v. *Boylston,* 2 Mass. 381; Story Com. Law sec. 512 *et seq.*

Most of the above authorities hold, that an administrator, who has received letters of administration under the author-

ity of one State, can not in another State prosecute or de-
fend an action by virtue of such letters.    This is clearly
correct, because one State can not give authority by virtue
of which any action can be maintained in another State.
Nearly all the authorities cited by the learned counsel are
reviewed in the very able opinion of Tucker, Pres't, in *Tun-
stall* v. *Pollard*, 11 Leigh 1.   In that case, which was elabo-
rately argued, it was held, that an executor having taken
probate of a will and letters testamentary in England and
collected the assets of the testator's estate there and brought
them with him to Virginia, having never qualified as execu-
tor in Virginia, is liable to be sued by the legatees in the
court of chancery in Virginia for an account of his adminis-
tration and for the legacies, which remain unpaid.    Tucker,
P., said :—

"The next question, which arises in this case, is whether
Benjamin Pollard, the executor ——— Garlick, is liable to
the suit of the plaintiff in Virginia, he having only proved
the will and obtained letters testamentary from the pre-
rogative Court of Canterbury in England.   Under his au-
thority as executor he received assets in England to a
large amount, which he brought to this country and wasted,
and this suit is brought not by creditors of Camm Garlick
but by the legatees under his will demanding a settlement
of the executorial account and a decree for the balance
of fund found to be due them.   The answer of the ex-
ecutor was filed in the former suits.   He set up no pretence
of the existence of debts in England, or of any danger to
him in paying over the funds in his hands, or of any conflict
between the laws of England and those of Virginia in re-
lation to the disposition of the assets ; nor did he object to
the jurisdiction of the courts of Virginia or to their authority
and power to call him to account. * * * *   I am of opinion,
that an executor, who has qualified and received assets in a
foreign country and has brought them into this jurisdiction is
liable to be sued and compelled to account here, although
he never has qualified as executor in Virginia, and although
he may have received no assets here.   I am moreover of
opinion, that, if suable at all, he is not to be sued as execu-
tor *de son tort*, which he can not be, if he be appointed exec-

37

utor by the testator. The intimation given by me in *Pugh* v. *Jones*, 6 Leigh 299, of a contrary opinion on this point, I am now satisfied is erroneous. * * * It is objected, it may be difficult to ascertain the foreign statute. How, it is asked (2 Mass. 387) shall we ascertain the laws of Indostan in relation to administrations, when one has died and left assets there? I answer:—Precisely as you would ascertain it, if a contract were made there. * * * Whatever of difficulty or inconvenience, that may be fancied to exist in the execution of this duty, it weighs little in the balance, in comparison with the burden, which would be imposed on creditors and distributees by refusing cognizance of their causes here, though the person and the property are both in our power, and sending them to sue in a foreign country, from which the executor has absconded with the whole of the assets in his pocket. How shall they sue him there, when he is not within the jurisdiction? How shall they reach the assets there, when he has eloigned them? Will it be said, his sureties may be sued? Admit it, if he has any—When they discharge the demand and become creditors, where shall they sue? Upon the principle assumed they could not sue him here and thus would be utterly without remedy. To such consequences are we led by the unnecessary adoption of the principle, that an absconding executor, who has eloigned or wasted his testator's estate, can only be sued in the jurisdiction, where he proved the will."

President Tucker disposes of *Selectmen* v. *Boylston*, 2 Mass. 384, so much relied on here by counsel for appellees, as follows :—

" To say nothing of the fact, that it was the case of an administrator, whose sole power is derived from the court of probate, instead of that of an executor, whose powers are derived from the will, it is sufficient to observe, that the case was expressly decided on a particular statute of Massachusetts, which provides for the grant of administration (in the case of a will, that has been proved in a foreign State) ' of the testator's estate *lying in that State* and for the settlement of the *said estate*'. "

On page 26 of the opinion the President says :—" It has been well settled ever since Dowdale's Case, 6 Coke,

that an executor in England receiving assets from abroad is liable to account for them in England. (See Ram on Assets 235 ; 1 Cromp. & J. 157, 370) and it never has been doubted I think, that, if an executor in Virginia receives from London the proceeds of a crop of tobacco sold there, he must account for them in the settlement of his accounts before our own tribunals. "

In *Evans* v. *Tatem*, 9 Serg. & R. 252, it was held, that a person taking out letters of administration in Pennsylvania may be sued in Tennessee for a debt due by the intestate. Tilghman, C. J., said :—" Was the defendant, who administered in Pennsylvania, liable to be sued in Tennessee for matters, which arose in the lifetime of the intestate ? I can perceive no good reasons against such a suit but many in its favor. If a person, who administers in one State and receives assets there, is not liable on his removal to another State, it would produce the greatest injustice.. The removal from State to State is the act of the administrator, which the creditors of the intestate can not prevent and therefore should not be prejudiced by it. The assets are to be administered according to the law of the State, within which the administration was granted, and justice requires, that the administrator should be held liable to the amount of the assets, which have come to his hands, in whatever State he may be found. "

In *Citizens' National Bank* v. *Sharp's Adm'r*, 53 Md. 521, it was decided, that " A voluntary payment by a debtor in this State to the executor or administrator of his creditor appointed in another State, in which the creditor had his domicile at the time of his death, is valid and a good discharge of the debt, when such payment has been made, before any administration has been granted in Maryland, and such payment is a bar to the claim of the domestic administrator afterwards appointed ; nor does the validity of such payment depend in any manner upon the fact of the non-existence of debts against the deceased in this State. " The cases cited by Bartol, C. J., to sustain this decision are the following :— *Williams* v. *Storrs*, 6 Johns. Ch'y 353 ; *Doolittle* v. *Lewis*, 7 Johns. Ch'y 56 ; *Rand* v. *Hubbard*, 4 Metc. 255 ; *Hutchins* v. *Bank*, 12 Metc. 421 ; *Parsons* v. *Lyman*, 20 N.

Y. 112; *Mackey* v. *Coxe*, 18 How. 104; *Wilkins* v. *Ellett*, 9 Wall. 740.

A testator in New Hampshire, who owned shares in a bank in Boston, made the following bequest to his wife, whom he made executrix of his will:—"All the property both real and personal I am possessed of during her life except my farm and in the town of W., no part of the bank-stock is to be disposed of unless her comfort should require it; but it is to be apportioned to my relations according to her discretion to be enjoyed by them after decease." She caused the will to be proved in New Hampshire and gave bond as executrix, but never caused the will to be allowed and recorded in this State according to the provisions of the statute. She also gave a power of attorney to a citizen of Boston authorizing him to sell the shares in the bank there, which were accordingly sold by him, and a transfer thereof was made to the purchaser in due form in the books of the bank. After the death of the executrix the will was duly allowed and recorded in Massachusetts, and administration with the will annexed was granted to H., who brought an action against the bank to recover the dividends on the shares from the time of the sale and transfer. It was held, that the executrix had the legal power to convert the shares into money without the aid of a probate court in Massachusetts, if she could do it without legal process;—that the bank was not bound to see to the application of the proceeds, nor to decide whether her comfort required the sale;—that if she had no power to appropriate the proceeds to her own use, or if she sold the shares, when she ought to have retained them, she was guilty of a violation of official duty, for which her sureties were responsible on the probate bond; and that the action could not be maintained. *Hutchins* v. *Bank*, 12 Metc. 421.

In delivering the opinion of the court Shaw, C. J., said:— "It is the duty of the executrix to administer the estate according to the lawful directions of the will; and to the performance of this duty she is bound by her bond to the judge of probate. If she had no authority to appropriate the proceeds of this sale in whole or in part to her own use under a just construction of the will; or if she sold these shares

when by the terms of the will she ought to have retained them, these are violations of the official duty, for which she and her sureties were responsible on the probate bond. This affords security, that the legal powers of an executor derived from the will and letters testamentary can not be abused to the injury of another without adequate means of redress. Certain rules and principles respecting the powers of an executor, we think, are settled beyond controversy. One is, that, if an executor or administrator have occasion to prosecute any suit in that capacity in any of the courts of this Commonwealth, he must be authorized by letters testamentary or letters of administration from some probate court in this State. Without it he has no standing in court, * * * *. We think, that the general rule of law is, that, where a will has been proved, and an executor has received letters testamentary in the State of the testator's domicil, the goods, chattels, choses in action and generally the personal property of the intestate vest in the executor. He holds them *in autre droit* certainly and is bound to inventory them and account for them, but still he has the legal interest in them and the custody and control of them (7 Johns. Ch'y *ubi supra*), *Dawes* v. *Boylston*, 9 Mass. 337; *Rand* v. *Hubbard*, 4 Metc. 252; *Wooly* v. *Clark*, 1 Dowl. & Ryl. 409; 5 Barn. & Ald. 744). If therefore such an executor can take possession of goods or effects in the hands of a bailee of his testator in another State by the voluntary act of such bailee, or if he can collect a debt due from a debtor in another State without the necessity in either case of commencing a suit, he has authority to do so and can give a good acquittance and discharge. This proposition is to be taken with the qualification, that such property is received or such debt paid, before the will is filed, or letters of administration are issued in the State, where the bailee or debtor lived. What would be the effect of such an appointment, whether it would or would not suspend or supersede the power of the original executrix, it is not necessary to consider in the present case; and we give no opinion."

In *Wilkins* v. *Ellett*, 9 Wall. 740, it was decided, that a voluntary payment of a debt to a foreign administrator was good as against the claim of an administrator duly appointed

at the domicil of the debtor, in which last place the debt was paid, there having been no creditors of the intestate in this last place, nor any persons there entitled as distributees.

Chief Justice Marshall in *Dixon's Exrs*, v. *Ramsey's Exrs.*, 3 Cranch 323, said :—"It is contended, that this case differs from that of an administrator, which was formerly decided in this Court, because the administrator derives his power of the estate of his intestate from the grant of the administration; but an executor derives it from the will of the testator, which has invested him with his whole personal estate, wherever it may be. This distinction does certainly exist; but the consequences deduced from it do not seem to follow. If an executor derived from the will of his testator a power to maintain a suit and obtain a judgment for a debt due his testator, it would seem reasonable, that he should exercise that power, wherever the authority of the will was acknowledged; but if he maintains the suit by virtue of his letters testamentary, he can only sue in courts, to which the power of these letters extends.   *   *   *   All rights to personal property are admitted to be regulated by the laws of the country, in which the testator lived; but the suits for these rights must be governed by the laws of that country, in which the tribunal is placed."

In *Sandilands* v. *Innes*, 2 Sim. 263 (5 Con. Eng. Ch'y 111) a creditor of a person, who died intestate in India, took out letters of administration on the estate of the deceased in that country, then came to England and obtained letters of administration from the prerogative court. Afterwards one of the intestate's next of kin procured that administration to be revoked and administration to be granted to himself. It was held, that the Indian administrator was compellable to account to him for assets possessed in India as well as in England in a suit instituted by him as personal representative only of the intestate, and to which the other next of kin, who were residents in India, were not parties. In that case the Vice Chancellor said :—"If Fairlie had brought any of the intestate's assets from India to this country, the plaintiff would clearly be entitled to have an account taken as to them; and the taking of that account would incidentally

make it necessary to have an account taken of all the assets possessed by Fairlie or his agent in India."

This Court held in *Leach* v. *Backner*, 19 W. Va. 33, that, when the same person qualified as domiciliary and ancillary administrator of an estate, and a part of the heirs and distributees lived in Ohio, where the intestate died, and where a part of his estate was situated, and the other heirs and distributees with the administrator lived in West Virginia, and the administrator made a fraudulent *ex parte* settlement of his account before a probate court in Ohio, in which he omitted to charge himself with $1,500.00, which he had received, and which, he fraudulently reported to said court he had settled in West Virginia, and by means of a false receipt he obtained in said Ohio settlement a credit for $500.00 and by such means brought the estate in debt to him in the sum of $1,700.00 and then came back to West Virginia and went before a commissioner to settle his accounts, in which he had himself credited with this false balance, a bill was properly filed by the heirs and distributees in West Virginia to surcharge and falsify his account and to prove, that the settlement in Ohio showed a false balance in his favor, and to have the account corrected. In that case many authorities touching this subject are reviewed.

In none of the cases, which we have seen, was the direct question decided, which is here presented, whether the sureties are liable for assets brought by the executor from another State into this and wasted. If the executor as such is liable, there can be no doubt, his sureties are. We have seen that the question has been discussed, and Chief Justice Shaw in the case cited from 12 Metc. seems to have no doubt of the liabilities of the sureties in such a case.

In *Kenion's Distributees* v. *Campbell*, 2 Humph., it appeared that John Kenton died in Missouri having some personal property in that State and some in the possession of his family in the State of Tennessee. W. Kenton administered on his estate in Tennessee and gave sureties for the performance of this trust in Tennessee; he then went to Missouri and obtained letters of administration upon the estate of the decedent in that State giving sureties for the performance of the trust. It was held, that these trusts were

distinct and independent of each other, and that the sureties in one State are not responsible to the distributees for the effects received into possession in the other; and that this is so, though the administrator may have brought the property obtained in Missouri to Tennessee, converted it into cash and made a return of the proceeds to the appropriate tribunal in Tennessee as assets. Reese, J., for the court said:—"It has been said, that it has not been unusual for a foreign administration to be granted, when specific chattels have existed, but that the domestic administrator often in such cases brings them home and disposes of them in the course of the domestic administration. We have not that case before us and therefore do not feel called to say, that the sureties of the administrator would not be bound. We decide the case before us and that only; that where a distinct and independent administration has been granted in the jurisdiction of the *situs* of the chattels or effects, and such jurisdiction be attached to them, they can not then be brought into the administration here so as to subject the surety."

The question presented here is the following:—When executors under the will of a man, who died in this State, where he made his will, in which he charges his executors to dispose of all his personal property and his land in Illinois and to distribute the proceeds in the manner directed by the will, dispose of the personal property in Maryland, where there were no letters testamentary granted, settled the debts against the estate there, bringing the residue of the proceeds and some of the property itself into West Virginia and disposing of it, sell the land in Illinois and receive its proceeds and use them in payment of the debts of the estate and receive credit therefor,—are they and their sureties liable for any improper disposition of said personal property, and the executors being insolvent, are the sureties liable for an unpaid balance due to the estate, so produced, when the executors have been required to account for the proceeds of such land and the personal property in Maryland by them so taken into possession and disposed of? It seems to be on both reason and authority, that the sureties are so liable. We do not pretend to say in a case, where an administrator is appointed in this State, whose only author-

ity is from the court that appoints him, who goes into another State and disposes of the assets of the estate there without there taking out letters of administration, that his sureties would or would not be liable for his acts; or that they would be so liable, in such case, if there had been administration granted to the same person in another State, under which he received the assets there and brought them into West Virginia. But we do say, that under the provisions of a will like the one before us the sureties of the executors are responsible for their acts regarding the assets in another State, where no letters testamentary had been granted.

The fifth exception is to the charge against the executors of $758.12 as amount received from Illinois land, because the proof shows, that it was not received by them as executors. I think, the proof shows, it was so received, and that they paid debts with the money and received credit therefor; and now having received the credit they seek to escape the charge. The court sustained the exception to the Revere House property charge in part and overruled it as to a small part, but sustained entire the exception as to the Illinois land. In this the court erred. The executors and their sureties should be charged with the proceeds of the Illinois land and, under the principles we have announced, with whatever the property at the Revere House, which taken possession of by the executors, was reasonably worth, subject to credits for debts paid in Maryland on account thereof.

The court properly overruled the 6th, 7th and 8th exceptions of the defendants. The 6th was because the report did not charge Harry P. Hooper with board at the Grafton House after testator's death; the 7th, that it did not charge the daughter, Rose P. Sullivan, with board at the same time and place; and the 8th, because it does not settle the accounts and transactions at the Grafton House after the death of the testator. With all this the executors as such had nothing to do.

An additional exception by defendant Jarvis is, that the commissioner based his report in part on certain depositions, which were, as it is claimed, in part against C. E. Hooper, who was dead, at the time some of them were taken. This

exception is too vague and indefinite. It does not designate any part of any deposition and would necessitate a search through the whole record. The court does not seem to have noticed this exception in the decree.

There is a further exception to the report by the defendants, because the executors were not credited with the payment of the rent of Revere House. These notes seem by the exception to have been executed by John W. Hooper, the testator, payable on the 1st day of April, 1872, and the 1st day of October, 1872. This exception is not noticed by the decree; but it appears, that Charles E. Hooper carried on the hotel himself after the decease of his father, and to the extent that he occupied the house he should himself have paid the rent. It does not appear upon what terms the house was surrendered.

The court overruled all of the exceptions of the plaintiffs and defendant Sarah Hooper.

Inasmuch as it is almost impossible to go through the account and decide what items are a proper charge and what are not, and as the case must go back for a re-statement of the account, which is mixed up with matters, that have nothing to do with it, I will only add, that, as we have already said, the executors should be charged with all the property owned by John W. Hooper at his death, which came into their hands from all sources whatever, or which ought to have come into their hands; and they should be credited with all legal demands against him at the time of his death including the proper costs of administration. Of course, the taxes on the real estate left to Mrs. Hooper by will are properly chargeable to her as the life-tenant, not to the estate. Of course no debt of another assumed by the testator is chargeable to the estate, unless that assumption was in writing. The commissioner should have stated the accounts of the executors between themselves; for it is clear, that Charles E. Hooper received a much larger portion of the estate than his brother, who has a right to have his own indebtedness to the estate clearly ascertained, so that he may not have to bear so great a burden. He is surety for his brother on the bond. Each executor is liable for all he receives, in the settlement of the accounts between them;

and having executed a joint bond they stand in the relation of principal and surety; each as principal *quoad* his own acts and as surety *quoad* the acts of his co-executor. ( *Caskin* v. *Harrison*, 76 Va. 85.)

The bill sets up the fact, that a second executorial bond was filed, and claims, that its only effect was to give additional security, and that it did nor relieve Jarvis, who was on the first bond but not on the second. Jarvis answers, that the second bond was executed to relieve him and had that effect; and that it was done after notice by him to the executors. This answer was replied to generally and no proof was taken by Jarvis to sustain his answer. The approved bond by the County Court appears in the records as an exhibit with the bill. The order of the County Court is as follows:—" At a County Court held for the county of Taylor on the 6th day of January, 1873, Charles E. Hooper and William S. Hooper, executors of the will of John W. Hooper, deceased, now here in open court, together with John Doonan, George Brinkman and William A. Turner, co-securities, entered into a new bond as such executors in the penalty of thirty thousand dollars, conditioned according to law, which bond was acknowledged by them and is approved and ordered to be recorded."

Sections 9 and 10 of chapter 87 of the code provide under certain circumstances for requiring a new bond for a fiduciary to be executed; and section 11 provides:—" Every bond executed with sureties under the two preceding sections shall without any express provision therein to that effect relate back to the time of the qualification of the fiduciary and bind the obligors therein for the faithful discharge of the duties of his office or trust from that time as effectually, as if it had been then executed; and the sureties in the former bond and their representatives shall upon the execution of such new bond be forthwith discharged except as to any matter, for which suit may be then pending on the former bond against any such sureties or their representatives, in which case such suit may be prosecuted to judgment or decree; but as to every such matter the new bond shall without any express provisions therein to that effect bind the obligors therein to indemnify the sureties in the

former bond against all loss or damage in consequence of executing the former bond."

With this plain statute before us, if compelled to decide the question on the record, as it now appears, we should hold, that Jarvis, who did not sign the new bond, was relieved by such new bond of his obligation on the former bond. (*Perry* v. *Campbell*, 10 W. Va. 228.) We do not know from the record, under what circumstances the new bond was executed; and very little with regard to such new bond appears, and no note is made of it by counsel for appellees. The reason no doubt is, that the briefs were filed on behalf of the administrator of Charles E. Hooper and Doonan and Brinkman, who of course did not wish Jarvis to be relieved. Jarvis is not in court represented by counsel. Under these circumstances, inasmuch as the cause must be remanded, we will not now decide, whether Jarvis is or is not released, and we will let the question be decided by the Circuit Court, when it shall obtain more light, if that can be had.

The decrees of the Circuit Court of Marion county of March 12, 1886, August 6, 1884, and November 14, 1883, are severally reversed with costs to the appellants; and this cause is remanded with instructions to set aside the report of Commissioner W. R. D. Dent and recommit the cause to the same or some other commissioner to re-take and settle the account according to the principles set forth in this opinion.

REVERSED. REMANDED.