76   85
97  242

76   85
98  362

## Richmond.

## CASKIE'S EX'ORS v. HARRISON AND ALS.

### January 12, 1882.

1. SURVIVING PARTNER.—At law he hath exclusive control over the firm assets in order to wind up the concern. In equity he is merely a trustee to pay the debts and divide the surplus.

2. IDEM—*Executor.*—Where same person is surviving partner and executor of his deceased co-partner, and has funds actually in hand not needed to pay the firm debts, he ought to pay them to himself as executor.

3. EXECUTORS—*Sureties.*—The general rule is that where same person is liable to pay money in one capacity, and to receive it in another, the law presumes he has done his duty within his power, and holds his sureties responsible in case he fails to do it. Same rule applies to executor indebted to his testator at time of qualification.

4. CO-EXECUTORS—*Liabilities—General rule—Exception.*—Executor is liable only for what he receives, and not for the *devastavit* of his companion; except where by his *laches* he suffers his companion to receive and waste the assets when by reasonable diligence he hath power to prevent it.

5. IDEM—*Joint bond.*—Where two or more execute a joint bond they stand in the relation of principal and surety—each as principal *quoad* his own acts, and as surety *quoad* the transactions of his companion.

6. BONDS.—Where the court hath power to take a bond, the liability of the obligors is ascertained from the bond itself, and not from the order of the court reciting the fact of its execution.

7. SURVIVING PARTNER—*Executor—Case at bar.*—John, of firm of J & J K C, died, testate, in September, 1867. Firm continues until January, 1868, when James is to be deemed surviving partner. James and two other sons of John are named and qualify as executors. The order of the probate court recites that they gave a joint and several bond without security, the will directing that none be required of them. The firm owed no debts. At decease of John, James owed the firm $10,000, and

before September, 1868, he had collected firm funds to the amount of $62,000, all of which he lost in private speculations in 1868. James advanced the firm of C & Bros., of which he was a member, $42,608.92, part of the firm funds held by him, and in 1868 withdrew $40,000 thereof and lost it in private speculations. On bill to settle the executorial accounts and have distribution—

HELD:

1. The liability of James for the funds wasted by him attached to him, not as surviving partner but as executor.

2. John's co-executors (and co-obligors) are bound *as sureties* for the misapplication of the assets by James as executor, not only for the amounts wasted but for the debt due from him at the decease of John.

3. The evidence does not show any such knowledge, *laches*, or neglect on the part of his co-executors with respect to the misapplication of the assets by James as fixes upon them a liability as executors.

4. Nor does the evidence show that the other members of the firm of C & Bros. were so implicated in the breach of trust by James, or derived such benefit from the transaction as to make them liable as co-partners, except as to the difference between the amount advanced and the amount withdrawn by James.

5. There is no proof of any agreement of John to allow appellants one-fifth of the profits of the concern of J & J K C.

6. The preliminary objections taken to the proceedings in the court below are untenable.

Appeal from decree of chancery court of Richmond city, rendered 13th January, 1874, in the suit of Caskie Harrison, Norvell Harrison and Percy Harrison, the two last named being infants, who sue by, &c., against Robert A. Caskie and Willie H. Caskie, in their own right, and as surviving executors of John Caskie, deceased; and also as surviving executors of James K. Caskie, deceased, who was one of the executors of John Caskie, deceased, John N. Caskie, J. Seddon Jones and Martha Norvell Jones, his wife, who was Martha Norvell Caskie, and Nannie C. Hutcherson.

Prior to September, 1867, the firm of J. & J. K. Caskie, composed of John Caskie, father, and James K. Caskie, son, did business in said city in buying, "handling" and selling tobacco. John died in September, 1867, testate.

His three sons—James K., Robert A. and Wm. H. Caskie— being named in the will as executors, qualified as such, and gave a joint and several bond without security, none being required by the will. By its terms, the partnership lasted until 1st January, 1868; after which date James was to be deemed surviving partner. *The firm owed no debts.* At the death of John, James owed the firm about $10,000. Between his death and September, 1868, James collected firm assets to the amount of about $62,000, nearly all of which were in the year 1868 embarked and lost by him in private cotton speculations. James advanced to Caskie & Bros., of which firm he was a member, $42,608.92, part of the late firm assets held by him as surviving partner, and in 1868 withdrew $40,000 thereof, and lost this sum also in similar speculations. In September, 1868, James K. Caskie died testate, his brothers, Robert A. and Willie H. Caskie, qualified as his executors. He left no personal estate. The object of this suit was to have settlement of the accounts of Robert A. and W. H. Caskie, as surviving executors of John Caskie, and of James K. Caskie, and of the accounts of James as surviving partner of J. & J. K. Caskie, and payment to the plaintiffs of the amounts coming to them as legatees under the will of their grandfather, John Caskie, deceased. The chancery court decreed that for the funds of the estate of John Caskie, deceased, which came into the hands of James K. Caskie, whether as surviving partner or otherwise, the latter was liable in his capacity as executor of John Caskie, and that Robert A. and W. H. Caskie were also liable as his sureties in their joint executorial bond, and that R. A. & W. H. Caskie were liable also for balance due by Caskie & Bros., composed of themselves and James K. Caskie, to J. & J. K. Caskie, or to estate of James K. Caskie; and that they and John N. Caskie are liable for balance due by Caskie & Bros., composed of themselves and John N. Caskie, to J. & J. K. Caskie, or to the estate of James K. Caskie, deceased.

From this decree the said Robert A. Caskie and William H. Caskie, executors as aforesaid, obtained an appeal to this court. The remaining facts and points relied on are fully stated in the opinion of the court.

*John A. Meredith,* for appellants.

*James Pleasants,* for appellees.

STAPLES, J., delivered the opinion of the court.

This cause has been very ably argued orally and in writing. It is important both as respects the principle involved and the amount in controversy. In discussing the several questions presented for our consideration, it will be convenient to consider them in the order in which they have been treated in the petition for an appeal. The first is, whether James Caskie is to be held answerable as executor, or merely as surviving partner, for the funds which came into his hands after the death of John Caskie, and which are the subject of this controversy. By the terms of the partnership between John and James Caskie, it is to be regarded as continuing till the 1st of January, 1868, notwithstanding the death of John Caskie in September, 1867. After the 1st of January, 1868, then James Caskie is to be deemed a surviving partner of the firm of J. & J. K. Caskie, and as such he was invested with the exclusive right to the possession, control and management of the partnership property, only so far, however, as was necessary to enable him to wind up the business of the concern with all practicable promptness and dispatch. His duty was first to pay the partnership debts, and if there were none, then to distribute the surplus among those entitled. Story on Partnership, § 343–4, 341. Whilst the surviving partner has the legal right to the possession of the effects, in equity

he is considered merely a trustee to pay creditors and to dispose of the remaining assets for the benefit of himself and the estate of the deceased partner. In the discharge of this duty he is held to account with all the strictness of an ordinary trustee. 5 Waite, Actions and Defences, 143, and cases cited.

It appears that at the death of John Caskie, James Caskie was indebted to the firm in the sum of $10,000 in round numbers. Between the death of John Caskie and the month of September, 1868, James Caskie collected funds belonging to the firm to the amount of about sixty-two thousand dollars, nearly all of which were in the year 1868 embarked and lost by him in private cotton speculation. I do not profess to be absolutely accurate in the sums stated; they are sufficiently so for all the purposes of this decision. Now, it is obvious that whatever may have been the trouble or delay in disposing of the tobacco in foreign ports, about which so much has been said by counsel, there could have been no sort of difficulty or obstacle in the way of a proper disposition of the funds actually received by James Caskie, and converted by him to his own private use. He was in possession of all the books, accounts and papers of the concern, and must be presumed to be familiar with its condition, assets and liabilities. He was also in possession of the funds as surviving partner after the 1st January, 1868. He knew, certainly, that the partnership owed no debts, and all he had to do was to divide the money as it was from time to time received between himself and the estate of his deceased partner. There was nothing in the circumstances by which he was surrounded to prevent a transfer from James Caskie, as surviving partner, to himself as executor of John Caskie, of so much of the funds so received as belonged to him in his fiduciary capacity. In accepting the office of executor, and taking upon himself the active management of the assets, he assumed the

responsibility of collecting, as executor, the amount due by himself as surviving partner.  With what sort of justice can he or his representative insist that the money might have been needed for partnership purposes, when he himself deliberately drew it out of the concern and expended it in private speculations ?

After advancing to the concern of Caskie & Brothers, of which he was a member, the large sum of $48,000, money held by him as surviving partner; after withdrawing more than $40,000 of the amount and literally throwing it away in disastrous adventures, upon what ground can it be maintained for him that he as surviving partner could not safely pay that sum to himself as executor?  As was said by Judge Joynes in *Harvey's Adm'or* v. *Steptoe,* p. 300: "When Thomas Steptoe, who was sole acting trustee and sole acting administrator, sold the trust property, after the death of James Steptoe, it became his duty to pay to himself, as trustee under the will, so much of the surplus money remaining after the payment of the debts secured by the deed as arose from the sales of the real estate, and to pay to himself, as administrator, so much of the said surplus as arose from the sales of the personal estate or the collection of debts.  Upon well-settled principles, the amount thus payable to himself as administrator was assets in his hands as such, for which his sureties were responsible. There was no need of any election on his part to make the transfer, in order to fix the liability of the sureties.  It was his duty to make it, and he could not lawfully refuse to do so after the purposes of the deed were satisfied."

The rule laid down by Judge Joynes is a well-established doctrine of courts of equity.  The learned counsel for the appellants relied with much seeming confidence upon *Smith* v. *Gregory,* 26 Gratt. 248.  No new principle was, however, announced in that case.  It decided that where the same person is both guardian and executor the court will

not shift the responsibility from one set of sureties to another without some act or declaration on the part of the executor indicating an intention to transfer the assets to himself as guardian. It further decides that an executor who has wasted the assets cannot, upon his subsequent qualification as guardian, relieve his sureties upon his executorial bond by electing to transfer his liability as executor to his account as guardian. This doctrine has of course no application to a case in which the surviving partner, being also executor, has the assets actually in hand, which, not being needed for partnership debts, ought to be paid to himself as executor. In *Morrow* v. *Peyton*, 8 Leigh, 54, this court held that where the estate of one intestate is indebted to the estate of another intestate, and the same person is administrator of both, and wastes the assets which he ought to have paid over to the creditor estate, the sureties for the due administration of the creditor estate are liable for the misapplication. This rule of law was approved in *Smith and Gregory*, and is in perfect harmony with the decision in that case.

In *Commonwealth* v. *Gould*, 118 Mass. 307, Chief Justice Gray thus clearly states the rule in question : "The receiver was bound by his bond to account for the money borrowed by him from the corporation before his appointment, and his omission to pay the amount thereof to himself as receiver was a breach of the bond for which he and his sureties are equally liable. The case falls within the general rule of law that where the same person is liable to pay money in one capacity, and to receive and account for it in another, the law presumes that he has done what was his duty and within his power to do, and holds him and his sureties responsible in case of failure to do it." In support of this proposition the learned judge cites a number of cases. The same principle applies where, as in this case, the executor is indebted to the estate of his testator at the

time of his qualification. In such case, the executor having voluntarily assumed the trust prevents any other person from receiving it, and being unable to sue himself he is considered having paid the debt; and holding in his hands the amount, as executor—it being the same hand which ought to pay that is to receive—it is therefore considered as actually paid. *Winship* v. *Bass et als.*, 12 Mass. 202; *Griffith* v. *Chew's Ex.*, 8 Serg. & Rawle, 32–3; 2 Williams on Executors, p. 1419, and cases cited in notes.

As was well said by Chief-Justice Shaw in *Stephens* v. *Gayland*, 11 Mass. 459: "There is no ceremony to be performed in paying the debt, and no mode of doing it but by considering the money to be in his hands as executor." And in *Brown et als.* v. *Lambert*, 33 Gratt. 268, Judge Burks, speaking with respect to the trustee in that case, said: "He could not have been expected to sue himself to compel payment; but he could have charged himself as trustee for the trust fund of which he was debtor. Whether he so charged himself or not, the law charged him, and the charge constitutes a debt due by him as trustee for persons under disabilities within the meaning of the statute."

These authorities would seem to be decisive of the question before us. They conclusively show that the liability of James Caskie for the funds wasted by him attaches to him, not as surviving partner, but in his character of executor of the estate of John Caskie.

The next question is, whether the appellants are liable as sureties upon the official bond of James Caskie for his misapplication and waste of the assets in his hands as executor.

John Caskie, by his will, appointed James Caskie and the appellants his executors, and he directed that no security should be required of them for the faithful discharge of their duties.

Accordingly, upon their qualification, they executed a

joint and several bond without security. In the order of the court admitting the bill to probate, it is recorded that the executors had given bond, but without security, the will directing that none should be required of them. The ground taken by the counsel for the appellants is that the appellants cannot be charged as sureties because the testator directed that no security should be required of his executors, and in the order it is expressly declared that none was required, the testator having dispensed with it; that the bond derives its force and effect from the order, and can impose no obligation in conflict with it, and therefore to construe the bond as creating the relation of principal and surety between the obligors is to give it an effect never contemplated by the testator, and inconsistent with the order of court from which it derives its sole efficacy as a binding instrument.

This is a very meagre statement of the very able and ingenious argument of the learned counsel for the appellants. It is upon this point he rests his hope of success in the case. Before examining it, it is necessary to ascertain what is the rule of law in respect to the operation and effect of joint and several bonds of executors and administrators for the faithful discharge of their duties. In *Morrow* v. *Peyton*, 8 Leigh, 54, it was held that where two administrators executed a joint administration bond each is to be regarded as the surety for the other, and if one commit a devastavit the other is chargeable for his acts as surety.

The learned counsel insists that this decision was made by two judges in a court of three—Judge Brooke dissenting. This is true; but the doctrine laid down in that case has been again and again recognized by this court. *Boyd's Ex'ors* v. *Boyd*, 3 Gratt. 112; *Cox* v. *Thomas*, 9 Gratt. 319.

In the last mentioned case Judge Allan said that *Morrow* v. *Peyton* had been followed since in other cases, and as the

legislature had not thought proper to interfere with the rule there laid down, although there had been a general revision of the law since that decision, it ought not now to be considered an open question. This was in 1852, and no case can be found since in which the rule thus established has been overruled, or even controverted. The same doctrine was laid down by Chief-Justice Marshall in *Green* v. *Hansbrough* and *Seddens* v. *Robertson*, 2 Brock. R. 166, 402, and is supported by numerous decisions elsewhere. Red. on Wills, part 2, p. 82, note 14.

It may, therefore, be considered as settled that where two or more executors or administrators execute a joint bond they are to be considered as standing in the relation to each other of principal and surety, each being considered principal as to his own acts, and surety as to the transactions of his companion.

We come now to enquire whether there is anything in the present case which takes the executorial bond out of the operation of this well-established rule. It is very clear that the intention of the testator was that his three sons should jointly qualify, and jointly execute the trusts of the will. He could have had no other object in appointing the three his executors. At common law executors have a joint authority and a joint interest in the property. They are esteemed in law as but one person, and as such represent the testator, although each may be responsible only for his own acts, and not for those of his co-executor. It was, no doubt, to this joint qualification and this joint authority the testator was looking when he declared that his executors should not be required to give surety. Having entire confidence in his sons, and supposing they would all act in executing the will, his purpose was that they should qualify without calling in any third person as surety for the faithful discharge of their duties. He certainly could not mean they should not give a joint bond if they

chose to do so, nor did he undertake to define or limit the effect of such bond if given. It is very probable he never bestowed a thought on the subject. Every one can see that the object of the court was to carry out the wishes of the testator. The order of probate is a mere recital of what has been previously done, and a statement of the reasons which influenced the court in dispensing with the usual security required of personal representatives. The bond does not, as seems to be supposed, derive its efficacy from the order.

It would be a valid and binding instrument, even though the record had been silent with respect to its execution. In *Cecil* v. *Early*, 10 Gratt. 188, this court held that the sureties of a deputy sheriff on his bond to the high sheriff are estopped to deny that the principal was deputy, although the county court did not enter of record that the deputy was a man of honesty, probity, and good demeanor, and that he took the oaths required by law. This decision was made in the very teeth of a statute declaring that a deputy sheriff should not perform any of the duties of his office until such oaths were taken and such entry made of record. In *Franklin* v. *Depriest*, 13 Gratt. 257, it was held that where the bond of an executor is made payable to four parties named, one of whom was not a member of the court at the time, yet, as the justices had declared and acknowledged that the four justices named were justices then sitting, they were estopped to deny the fact, although it was in direct contradiction of the record. See also *Wonlath* v. *Coms*, 15 Gratt. 157. These cases show that where the court has authority to take a bond from a fiduciary, the nature and extent of the liability assumed by the parties is ascertained by the bond itself, and not by any mere order of court reciting the fact of its execution. In the case before us the instrument is plain and unambiguous in its terms. In construing it no resort to extraneous circumstances is

necessary. It is a joint and several obligation, binding each and all of them, parties to a faithful administration of the assets. As such it is not at all inconsistent with the order of the court; for although the court might, in conformity with the wishes of the testator, allow the three executors named to qualify and give bond without surety, it did not prohibit them from entering into a joint obligation, and thus assuming among themselves the relation of principal and surety, if they voluntarily choose to do so. As such it was accepted by the court, and no order afterwards entered on another day or on the same day can change or modify its legal operation and effect. Persons interested in the estate upon looking at the bond would discover that the executors were bound for the acts of each other, and might therefore be content with the security thus furnished. It was said by Judge Allen, in *Gibson* v. *Beckham,* 16 Gratt. 334: "These principles are essential to the security of the public and individuals. Bonds of clerks and other officers of administration are taken in the absence of those who may be most affected by the acts of such functionaries, and should be sustained unless clearly made invalid by law."

For these reasons I am of opinion that these appellants are bound as sureties for the misapplication of the assets by James Caskie as executor.

All that has been said in this opinion applies as well to the sum of $42,608.92, part of the funds advanced by James Caskie to the partnership of Caskie & Brothers, as to any of the assets misapplied by him. As already stated, this money was collected by James Caskie as surviving partner of J. & J. K. Caskie, was placed by him to the credit of Caskie & Brothers, was afterwards, in the year 1868, to the amount of $40,301.59, drawn out of that concern by James Caskie and expended by him in cotton speculations.

According to the views already presented, the appellants

are liable for the devastavit as sureties of James Caskie upon his executorial bond; and so the chancellor decided. He was, however, also of the opinion that the appellants are chargeable with this fund primarily as executors of John Caskie. This question, it seems to me, is not now so material to be decided, inasmuch as the appellees, in obtaining a decree against the appellants as sureties, have obtained all the substantial fruits of the controversy. If, however, it was necessary to determine the point, I am not satisfied the appellants are answerable for this fund primarily as executors. Upon well settled principles of law, where there are two or more executors or administrators, each has a several right to receive the assets of the estate, and he alone is consequently liable for what is so received. As a general rule, therefore, one executor cannot be charged with the devastavit of his companion any further than he is shown to have been knowing and assenting at the time to the devastavit. Merely permitting his executor to possess the assets without going further and concurring in the misapplication does not render him responsible for the receipts of his co-executor. *Frazier* v. *Bevil and als.*, 11 Gratt. 98 ; *Peters* v. *Boresly*, 11 Peters, 503.

An executor may be held liable if by his own laches or neglect he suffers his companion to receive and waste the assets when he has the power to prevent such receipt and misapplication by the exercise of reasonable diligence.

In *Williams* v. *Nixon*, 3 Bear An. 472, Lord Langdale said : "There can be no doubt that if an executor knows that the moneys received by his co-executor are not applied according to the trusts of the will, and stands by and acquiesces in it, without doing anything on his part to procure the due execution of the trusts of the will, in respect of the negligence he himself will be charged with the loss. But in cases of this kind, it is always to be observed that the testator himself, having invested certain persons with the

character of executors, has trusted them to the extent to which the law allows them to act as executors."

He further said he "knew of no case in which the court has gone to the length of saying that an executor shall be held primarily answerable for standing by and permitting his co-executor to do that which, for anything he knows to the contrary, was a performance of the trusts of the will." In the case before us there may be a strong suspicion that the appellants were apprised that James Caskie was using trust funds in his cotton speculations, but there is no positive proof of the fact, direct or circumstantial. The strongest argument against them is, they had every reason to believe that James Caskie was not possessed of means of his own to carry on these speculations. But this is a mere matter of inference, not founded upon any satisfactory proof. If they had access to the partnership books of Caskie & Brothers, which were under the control and management of James Caskie, these books furnished, according to Mr. Pleasants, no specific or reliable information on the subject. This witness, in answer to a question propounded to him, said "that the books not being posted, the appellants could have no accurate information as to the condition of either concern; nor is there anything in the books or papers to show, as far as he knew, that the appellants knew of this use of the money of John and James Caskie."

Indeed, the testimony of Mr. Pleasants shows that if the appellants were apprised of the waste and misapplication of the assets by James Caskie, it must have been from outside sources exclusively, and of this there is not the slightest proof in the record.

My opinion therefore is, that the evidence does not show any such knowledge, *laches,* or neglect on the part of the appellants, with respect to the misapplication of the assets by James Caskie, as fixes upon them a liability in their character as executors.

Are they responsible as co-partners in the firm of Caskie & Bros.? This question is even less material than the other. For the decree against the appellants as co-partners adds nothing to the surety of the appellees. As, however, the chancellor has passed upon the point, I suppose we also must decide it. What has been already said shows, or tends to show, that the appellants were not informed of the conduct of James Caskie in advancing the funds in his hands as surviving partner to the firm of Caskie & Bros.

That these funds were not applied to the use of Caskie & Bros. is very clear. Mr. Pleasants says, after a careful examination of the books, he finds that the firm could have used but a small part of the sum charged to that firm by James Caskie—say, between $2,000 and $3,000. For while James Caskie charged the firm of Caskie & Bros. with a balance of $42,608.92, he drew from that firm for his own use, and within the space of a few months, and charged to himself, a sum nearly as large—say, $40,301.59. It is claimed, however, that the transaction constituted a loan by James Caskie to the firm of Caskie & Bros., and it is therefore quite immaterial whether the appellants knew of the deposit, or whether the firm did or did not derive any benefit from it.

Let us suppose, then, that James Caskie was before the court asserting the alleged loan; the answer to his demand would be that he had drawn out of the concern the larger portion of the amount advanced by him, and had appropriated it to his individual use. And this would be quite a sufficient answer to the demand. As between James Caskie and the appellants the transaction may have been a loan, but not as between the appellants and the appellees. If the latter have any valid claim to a recovery, it is upon the ground of a fraud or breach of trust committed by James Caskie in investing trust funds in the concern of Caskie & Brothers.

Now, I take it, to make good this claim it must appear either that the appellants, as co-partners, knew of the misapplication and in some way participated in it, or that the funds were applied to partnership purposes. In *ex parte Heaton, Brock,* 386, a father and his sons were partners, and the three sons were trustees under a will, and instead of applying the trust moneys according to the trust they appropriated them to partnership purposes, and it was held that the firm could not be held liable unless it could be shown that they were employed for the use of the partnership trade with the knowledge of the father that they were trust funds. And in 1st Collyer on Partnerships, section 457, it is laid down that it is not sufficient the firm has had the benefit of the trust moneys. To be liable the firm must be implicated in the breach of trust, and this cannot be unless all the partners knew whence the money came or knew that the money did not belong to the partner making use of it."

This is carrying the doctrine much further than is necessary for any of the purposes of this case, and I do not wish to be understood as approving it as thus broadly laid down. Certainly, parties complaining of the misapplication of trust funds ought to show that the partnership is implicated in the breach of trust, or that it has derived some benefit from the transaction. It has been already seen that neither of these facts appear in the present case. Whilst, therefore, the appellants are liable as co-partners for the $2,000 or $3,000 mentioned by Mr. Pleasants, I do not think they are responsible for the funds drawn out by James Caskie and converted to his own use and benefit.

The next ground of error is that the chancery court improperly charged the appellants with the balance appearing to be due by them individually in the books of J. & J. K. Caskie.

It is insisted by them that under an agreement with

John Caskie, the father, they are entitled each to one-fifth of the profits in the concern of J. & J. K. Caskie.

The difficulty with the appellants is, that they have no proof of the existence of the alleged agreement. It will not be seriously maintained for a moment that either of them is a competent witness to establish such a contract with the testator. The testimony of Mr. Waldrop shows merely that John Caskie said it was his purpose to allow each of his sons (Robert A. and William H. Caskie) one-eighth interest in his business out of his own individual interest in the concern.

It would seem from this Mr. Caskie's purpose was to allow each one-eighth, and not one-fifth, as now claimed by the appellants. But whether one-eighth or one-fifth, it was the expression merely of an intention on the part of Mr. Caskie.

The witness does not. prove, nor did Mr. Caskie state, there was any contract between himself and his sons, or even any promise on his part to make the alleged allowance. Such a declaratien made by Mr. Caskie would, of course, be a mere *nudum pactus*, which he might or might not carry out at his pleasure. In the will of Mr. Caskie there is not the slightest reference to any such purpose on his part, and it is manifest to allow these appellants each one-fifth claimed, would be to violate the whole scheme of equality pervading that instrument. Nor is there on the books or the papers of the partnership of J. & J. K. Caskie any memorandum or allusion whatever tending to show the existence of the alleged agreement, or promise on the part of John Caskie. Whilst he has regularly charged the appellants with the advances made to them, he has not put upon his books any credits for the profits they now claim as a set off against these advances.

This record shows, and, indeed, it is conceded on all sides, that Mr. Caskie was a man of the strictest integrity, and of

a high order of business talent.  It is difficult to believe that had there been any such understanding as is now alleged Mr. Caskie would not have left behind him some proof of the fact—some entry or statement tending to show it.  There are other facts and circumstances which strongly militate against the claim of the appellants.  But it is unnecessary to consume time in mentioning them.  Enough has been said to show the utter want of competent evidence to establish the claim set up by the appellants.

Before concluding the opinion, it is proper to say that there are two preliminary objections taken by the appellants to the proceedings of the court below.

If these objections were tenable, I do not see in what manner they would affect or modify the decision so far as the merits of this controversy are concerned.

The objections are, however, not sound, as is demonstrated by the printed argument of the appellees' counsel.  I do not deem it necessary to discuss them, as this opinion has already extended to a great length.  Subject to the exceptions already mentioned, the decree of the chancery court must be affirmed.

DECREE AFFIRMED.