# WHEELING.

## HOOPER *v.* HOOPER.

Submitted January 18, 1889.—Decided June 27, 1889.

1. EXECUTORS AND ADMINISTRATORS—PARTNERS—SURETIES.

Two parties are engaged in business in another state,—one living in this state, one in the other,—and the one living in this state dies, and the other becomes one of his executors under a qualification in this State. At his death the business is to be closed up, and partnership-debts are to be collected and paid, and the effects sold. If, when this is accomplished, the survivor is insolvent, the sureties in the executorial bond are not liable for the interest of the deceased in the partnership ; but if said survivor is then solvent, they are liable.

2. EXECUTORS AND ADMINISTRATORS—PARTNERS—SURETIES

If at the time when it may be said under the law, that the business was in such condition, that it was the duty of the survivor to turn into his hands as executor the share of the deceased in the assets, the survivor was insolvent, his sureties in such bond are not liable ; if he is then solvent, they are liable.

3. EXECUTORS AND ADMINSTRATORS—PARTNERS—SURETIES.

If, when the survivor makes a statement of receipts and disbursements as surviving partner in winding up the business showing a balance in his hands to be divided, he is insolvent, so that such balance is not substantial assets, his sureties in such bond are not liable for such balance ; if he is then solvent, they are liable.

4. EXECUTORS AND ADMINISTRATORS—SURETIES.

Liability of sureties in the bond of an executor or administrator is limited by the terms of the covenant of the bond and can not be extended by implication.

5. EXECUTORS AND ADMINISTRATORS.

A judgment against an executor is conclusive both as to the validity and amount of the demand on both executors and legatees.

6. SALE—PROMISE.

Where A. for a valuable consideration paid by him purchases property of B , which is by the terms of the sale to be conveyed to C. and is afterwards so conveyed, and C. promises in consideration thereof to pay a debt due from A. to D., the promise of C. to pay such debt though not in writing is binding on him, if assented to by D.

7. WITNESS.

After C.'s death D. is a competent witness to prove C.'s promise.

8. EXECUTORS AND ADMINISTRATORS—NEGLIGENCE.

An executor is not to be charged with a debt when it becomes due, but only when he actually receives it, unless it is shown to have been lost by his negligence or improper conduct.

9. EXECUTORS AND ADMINISTRATORS.

A debt due to an executor individually from a legatee may be insisted on as part payment of the legatee's legacy.

*Woods & Martin* for appellants.

*A. F. Haymond* for appellees.

BRANNON, JUDGE:

This cause has been in this Court once before. See 29 W. Va. 276 (1 S. E. Rep. 280). Since it was remanded to the Circuit Court of Marion county, additional evidence has been taken, and a further report has been made by Commissioner Hayden, to which exceptions were filed by plaintiffs and defendant Sarah Hooper, and by defendants Brinkman, Doonan, and Grimes, administrator of Charles E. Hooper, and by defendant Whitescarver. On these exceptions the case here turns. This is an appeal from a decree of the Circuit Court of Marion, taken by the plaintiffs and Sarah Hooper; and some errors have been assigned by defendants Brinkman and Doonan.

A very important matter in the cause, raised by appellants' exceptions Nos. 1-5, inclusive, is as to certain furniture and other personal property employed in the operation of a hotel at Cumberland, in the State of Maryland, known as the "Revere House." Shall its value be decreed against the sureties in the executorial bond given by W. S. Hooper and Charles E. Hooper as executors of John W. Hooper, deceased, upon their qualification before the recorder of Taylor county, West Virginia?

The bill treats this property as the property of the decedent, John W. Hooper, never suggesting, that it was the property of a partnership composed of John W. Hooper and his son, Charles E. Hooper, one of his executors; but Charles E. Hooper in his answer denies, that it was the property of

John W. Hooper, and alleges, that such a firm existed, and that this property was owned by said firm.

When Judge JOHNSON delivered the opinion on the former appeal, he held that the evidence did not establish such a partnership, and hence he did not place the opinion on that basis, but treated this property as the sole property of John W. Hooper. The question then arose whether this hotel-property, which at John Hooper's death was in Cumberland in the hands of Charles E. Hooper, who was managing said hotel, and part of which was there sold by Charles E. Hooper, and a part brought into this State and sold by him, could be charged to the executors and their sureties. Judge JOHNSON, after discussing the case of *Tunstall* v. *Pollard*, 11 Leigh, 1, and other cases, says : "In none of the cases, which we have seen, was the direct question decided which is here presented, whether the sureties are liable for goods brought by the executor from another state into this and wasted. If the executor, as such, is liable, there can be no doubt his sureties are." Nor did he decide the question, though his evident leaning is in favor of the position that they would be liable. As I do not think the case, as it now is, involves that question, I simply refer to authorities bearing on it. *Tunstall* v. *Pollard*, 11 Leigh, 1; *Powell* v. *Stratton*, 11 Gratt. 792; 1. Rob. Pr., (New,) 162, 166, 189, 191, 192 ; Schouler, Ex'rs, §§ 174–176 ; *Andrews* v. *Avory*, 14 Gratt. 229; *Mackey* v. *Coxe*, 18 How. 104 ; *Wilkins* v. *Ellett*, 9, Wall. 740 ; and cases cited 29 W. Va. 291 (1 S. E. Rep. 280 ); *Burnley* v. *Duke*, 2 Rob. (Va.) 130.

As above stated, Judge JOHNSON did not decide the question just indicated; but his decision, that the bond held its obligors liable for this hotel-property, rested on the fact, that the will directed the sale of testator's personal property, "wherever situated," and, the bond having covenanted for a faithful discharge by the executors of their duties under the will, the court held the sureties responsible for the proceeds of such sale. But since that decision evidence taken in the case has established, that a partnership existed between John W. Hooper and Charles E. Hooper in the name of J. W. & C. E. Hooper in the carrying on of the Revere House hotel, and the property in question was property of the firm not of John W. Hooper solely ; and so this clause of the will di-

recting the sale of testator's property could not apply to it, and therefore the reason so pointedly stated by Judge JOHN-SON on page 297, 29 W. Va. (1 S. E. Rep. 296) as the ground of the decision, does not now apply. The able counsel for appellants in his brief virtually concedes that this partnership has been proven, and argues on that basis.

Therefore the question now is: Are the sureties in the executorial bond liable for the testator's interest in. this property? At testator's death this property was in the hands of Charles E. Hooper, the legal title vesting in him as surviving partner with power to sell. *Hooper* v. *Hooper*, 29 W. Va. 285 (1 S. E. Rep. 280). It was the duty of Charles E. Hooper as surviving partner to close the business, collect the assets, dispose of the effects and after settling debts against the firm to adjust the accounts between himself and his co-partner, and turn over to his estate his interest in the net social assets after discharging the social debts. But this duty, we may say, arose before the executorial bond was given; at least he had formed a relation,—that of co-partner,—from which that duty might at any moment fall upon him. It did fall upon him. Then this property was in his sole and exclusive possession as surviving partner and in another state. He still carries on the hotel for eight months after his father's death, and incurred expenses in so doing, lost in so doing the property there in larger part, brought some to this State, sold it, and wasted it. It is true, he had no right after his father's death to continue this business. Story, Part. § 343; *Hooper* v. *Hooper*, *supra*. But he did continue it. Are the sureties liable for the misconduct and waste of the partnership-property by the surviving partner, because he was executor?

The liability of a surety in the bond of an administrator or executor is limited by the terms of its covenants and can not be extended by implication. 7 Amer. & Eng. Cyclop. Law, 217. Courts go no further against sureties, than the scope of their obligation compels. Brandt, Sur. § 102. The condition of the bond in this case is for the faithful discharge of their duties as executors. Clearly the duty of closing the partnership and paying over to himself as executor the share of John W. Hooper in the firm assets rested on Charles E. Hooper as surviving partner, in the first instance;

(1) because his position as partner with all duties which might ensue therefrom, began before he became executor; (2) because the legal title of the partnership property, the exclusive possession, the sole and absolute power of selling it and the function of paying debts were all vested in him. John W. Hooper's estate was not at the instant of his death vested with any right to a specific sum in it, but only an interest to be developed by a collection and disposition of the firm-assets and satisfaction of the firm-debts. Before his estate could be said to have any defined interest, it must undergo closing and settlement consisting, it may be, in the performance of many acts with the consumption of considerable time. This did not take place for a considerable time after his death, if it even has yet; and when it did take place, C. E. Hooper may have been insolvent, for there is considerable evidence to show his insolvency. The sureties did not expressly stipulate in the bond for the proper performance of C. E. Hooper's duty as surviving partner; but it is claimed, that, as C. E. Hooper had these partnership-assets in his hands and should have saved and accounted for them and not wasted them, as they were a debt due from him to the estate, he should have collected them as well from himself as if they had been in the hands of another person. But the answer is, that until the closing of the partnership there was no ascertained debt in favor of the estate, and he may have failed in his duty as partner, before the time came for him to act as executor in reference to that fund, and, when that time arrived, he was perhaps insolvent.

It is also to be added, that this property was in another state, the business in another state, and he sold and realized the bulk of the assets there and never brought a large part of the property into this State; he brought here, if insolvent, only a naked liability of an insolvant man. If he had given a bond as partner and was insolvent, could the sureties in that bond shift the liability from their shoulders to rest upon the sureties in the executorial bond? I think not.

In *Gilmer's Adm'r* v. *Baker's Adm'r*, 24 W. Va. 72, it was held: An insolvent fiduciary can not transfer his mere indebtedness in one capacity to himself in another capacity, so as to exonerate his sureties in the one capacity, and throw

the burden upon his sureties in the other. To make the transfer valid in such case it must consist of something more than a naked liability; it must be substantial assets. But if substantial assets be in the hands of the fiduciary, or he is solvent and liable to pay over his indebtedness in the one capacity to himself in the other capacity, all that is required to make the transfer in such case is for him to make his election to hold it in the latter capacity, and manifest that election by some act, admission, or declaration, and such election will bind his sureties on his bond given in the latter capacity."

These principles apply to this case. The sureties did not guaranty for the conduct of the surviving partner. If he acted badly as such, and at the time, when he should have turned over the assets as surviving partner to himself as executor, at the close of the partnership, he was insolvent, why should the sureties pay his defaults as surviving partner? In *Pearson* v. *Keedy*, 6 B. Mon. 128, the Kentucky court of appeals held, that partnership funds coming to the hands of a surviving partner, who has been appointed administrator of a deceased partner, come to him as survivor not administrator, and that the sureties are not liable therefor. We do not go so far. But we hold, that, if the survivor wastes the social assets, and, when the partnership affairs are or under the law should be regarded as closed, the survivor is insolvent, his sureties as personal representative are not liable; but, if he is solvent at that time, they are liable.

The case of *Caskie's Ex'rs* v. *Harrison*, 76 Va. 85, is cited as sustaining the contrary. That case may be distinguished from this on its particular facts. Judge STAPLES, in his opinion, says: "It appears that, at the death of John Caskie, James Caskie was indebted to the firm $10,000.00 in round numbers. Between the death of John Caskie and the month of September, James Caskie collected funds belonging to the firm to the amount of $62,000.00, nearly all of which were in the year 1868 embarked and lost by him in private cotton speculation. * * * It is obvious that whatever may have been the trouble or delay in disposing of the tobacco in foreign ports, there could have been no sort of difficulty or obstacle in the way of a proper disposition of the funds

actually received by James Caskie, and converted by him to his own private use. He was in possession of all the books, accounts, and papers of the concern, and must be presumed to be familiar with its condition, assets, and liabilities. * * * He knew certainly that the partnership owed no debts, and all he had to do was to divide the money, as it was from time to time received, between himself and the estate of his deceased partner."

Here note that the firm owed no debts. The reporter puts that fact in italics. Note that Judge STAPLES thought, that, this being so, the survivor should have turned over the half of the $10,000.00 and the $62,000.00 at once, because they were not needed to adjust partnership-debts. Note that he seems to recognize a distinction between this money actually realized and the tobacco in foreign ports. Note that these sums actually in the hands of the executor and not needed for partnership-debts were invested by the survivor in his own private cotton speculations.

But in this case at the death of John W. Hooper the assets were to be sold and collected, and debts were to be paid, both consisting of many items as claimed by exhibits filed by Charles E. Hooper, and which he testifies to. The surviving partner never did any act electing to hold this property as executor except in regard to the sum of $223.35, the balance shown by his said exhibit, which was charged against the sureties by the decree. But we are without *data* to decide finally this feature of the case. There has been no settlement of partnership-accounts in this case. There are several questions, which the record does not satisfactorily answer. Was there any and, if any, what surplus remaining after payment of partnership-debts? What was the amount of John W. Hooper's interest in such surplus all or a part of it? When was the partnership closed? When were its last debts paid? When the partnership was closed, was Charles E. Hooper insolvent? If he was then insolvent, the sureties would not be bound for the interest of John W. Hooper in such surplus; otherwise they would. There must be a formal settlement of the partnership-accounts to ascertain what was the surplus, if any, and John W. Hooper's interest in it, and to ascertain the date of the close of the partnership,—

that is, when the last substantial debt was collected, or the last valid debts paid, (*Boggs* v. *Johnson*, 26 W. Va. 825 ; *Sandy* v. *Randall*, 20 W. Va. 244;) and whether, when such close of partnership occurred, Charles E. Hooper was insolvent. The Circuit Court erred in acting on this partnership matter against the appellants in decreeing only $223.35, without having a settlement of the partnership-accounts; and against appellees in decreeing even that sum in the absence of such definite settlement.

Appellants' Exception No. 6. Shea debt. In their *ex parte* settlement this note was charged to executors principal and interest by separate items. This makes it *prima facie* a correct charge. In his answer Charles E. Hooper alleges, that it was not collected, but there is a general replication to this answer. The note is not produced, so far as I see, or proven in executor's hands. If not collected, why not produce it? Though with that settlement there is returned a list of insolvent notes, this is not among them. Charles E. Hooper does not in his deposition say anything about it. Shea's mother testifies, that he never had any property, but does not say, he never paid this note. We think it should be charged, and that there was error in overruling this exception.

Appellants' Exception No. 7. George W. Brown & Co. debt, $271.02. In the first *ex parte* settlement are found two items of $200.00 and $231.22, allowed as disbursements to the executors for payments to George Brown. Turning to the account made out in name of G. W. Brown & Co. against J. W. Hooper these two items are found there as payments. This is the same account. The receipt was signed "G. W. Brown." Hence the items credited in the *ex parte* settlement are credited in his name. Their presence in that settlement makes them *prima facia* correct. C. E. Hooper makes oath to the justness of the charge, and the affidavit of G. W. Brown asserts their justness and the fact of payment by the executor. C. E. Hooper in his deposition says, he examined into this and other demands and believed them just. John W. Hooper kept the large hotel known as the "Grafton House" and an eating house at Parkersburg, and the charges are for whisky,—an article likely

to be consumed in such business. I do not think the charge should be disallowed. The account was for a larger amount, but some of it was sold after John W. Hooper's death, while, as the evidence shows, the family still kept the Grafton House; but the commissioner has allowed only the sales prior to John W. Hooper's death, two items of $91.32 and $179.70, making the $271.02. No error in overruling this exception.

Appellants' Exception No. 8. Rogers' debt. The credit of $762.02 is erroneous. Rogers sued the executors in *assumpsit* on this beef account, and recovered judgment for $570.43. The matter in issue in that action was, whether any and, if any, what amount was due from Hooper's estate to Rogers; and the judgment is conclusive as to the validity and the amount of debt both on the executors and the legatees. Bigelow, Estop. 78; *Corrothers* v. *Sargent* 20 W. Va. 351. "A judgment against an administrator is binding on the creditors and legatees of the estate." Freem. Judgm. § 163. There was error in overruling this exception.

Appellants' Exception No. 9. John W. Hamilton's debt. Charles E. Hooper owed Hamilton $1,000.00. Said Hooper sold a stock of goods to Casteel for $1,000.00 of which $100.00 was paid in cash, $1,000.00 in a lot in Grafton. By the agreement of sale this lot was to be conveyed and was afterwards conveyed by Casteel to John W. Hooper, and the $100.00 cash payment was credited by Casteel on an account of his against John W. Hooper. Of this arrangement John W. Hooper was aware, approved it and accepted the deed for the lot from Casteel, in fact most likely advised and procured the arrangement. He allows his son to sell his goods to pay for a lot to be conveyed to him, and in consideration of such conveyance promises to pay Hamilton this $1,000.00 debt due him from the son. It is contended by the plaintiffs, that it is not a valid debt against John W. Hooper's estate, because it was a promise to pay the debt of another and not being in writing is void under Code, c. 98, ¶ 4, which provides: "No action shall be brought to charge any person upon a promise to answer for the debt, default or misdoings of another," unless the promise be written. This statute does not apply to this matter. It is a part of what is called in the law-books

"the statute of frauds and perjuries" and was made to sup-
press frauds; but, if applied here, it perpetrates a fraud.
This instance is simply an original promise by John W.
Hooper based on the valuable consideration of a conveyance
of a lot to him to pay money in return as purchase-money
for the lot. He buys property and agrees to pay for it.
Does not the transaction create a debt against him? Is it
not his own debt he agrees the pay? The mere circum-
stance, that he agreed to pay that debt in a particular way,—
that is pay it to Hamilton on a debt due him from Charles
E. Hooper,—does not make it any the less his own debt.
He might have agreed to buy property and deliver it to
Charles E. Hooper or to deposit the money in bank or to
pay a debt for him. The stipulation to pay it to Hamilton
was but an incident or circumstance in the transaction not
its essence; for that was the reception by John W. Hooper
of property and his promise to pay for it, Browne, St.
Frauds, § 166, says:

"Under the same head may be treated those arrange-
ments frequently made by which one man who owes a debt
to another agrees with him to discharge the obligation by
assuming and paying a debt which he (the creditor) owes to
a third person. Upon such an agreement, if so communi-
cated to him and accepted by him as to make him privy to
it, such third person may of course resort to the party
making the promise, and recover the amount of his immedi-
ate debtor's obligation. Nor is the promise of the defend-
ant in such case within the statute of frauds, as to pay the
debt of another."

In *Barker* v. *Bucklin*, 2 Denio, 45, a party owed a debt and
delivered to his brother horses, and the latter agreed to pay
their price to the creditor on his debt against his brother;
Judge JEWETT says: " It was not a promise to answer for
the debt of another person, but merely to pay the debt of
the party making the promise, to a particular person desig-
nated by him, to whom the debt belonged, and who had
a right to make such payment a part of the contract of
sale. Such promise was no more within the statute of
frauds than it would have been if the defendant had promised
to pay the price of the horses directly to his brother, from
whom he purchased them."

If Charles E. Hooper himself had conveyed the lot to his father for $1.000.00 to be paid to Hamilton, he assenting, would not such promise, though oral, have been valid? He procured another to convey it. He simply procured another to convey it, he paying his stock of goods, thus prejudicing himself, which would be a valuable consideration moving from him.

In *Dearborn* v. *Parks*, 5 Greenl. 81, a purchaser of land agreed as part of the price to pay outstanding notes of vendor on the land. The court held it good not in writing, Judge WESTON saying, that, although the effect was to pay another's debt, yet the defendant paid his own debt, and that constituted " the operative motive by which he was actuated." If there is an understanding between the parties, that the defendant in consideration of his own indebtedness shall pay the plaintiff what is owing him by another, it seems reasonable to regard the transaction as a mere payment by the defendant of his own debt, though the language of the parties would not be formal to that effect. Browne, St. Frauds, § 166 *et seq.* Roberts states the rule to be, that, if the consideration of the new promise. " spring out of any new transaction or move to the party promising on some fresh and substantive ground of a personal concern to himself, the statute of frauds does not attach." See Browne, St. Frauds, § 212.

In *Sayre* v. *Edwards*, 19 W. Va. 359, where it was argued, that the promise was void under the statute, JOHNSON, P., said : " This is incorrect, because it was not to pay the debt of another, but to pay an obligation which he had individually assumed ; that is, to pay his own debt."

Judge LEE, in *Hopkins* v. *Richardson*, 9 Gratt. 494, says of the promise in that case : " It seems to fall rather within the third class of cases mentioned in Story on Promissory Notes, § 457, where the promise to pay the debt of another arises out of some new and original consideration of benefit or harm moving between the newly contracting parties, which class of cases, the author adds, is not within the statute of frauds. The distinction between this class of cases and those in which the promise is regarded as an undertaking for the debt of another within the statute of frauds is

also recognized in *Forth* v. *Stanton*, 1 Saund. 211, note 2, and by Chief Justice KENT, * * * in *Leonard* v. *Vredenburg*, 8 Johns. 29–32."

" The statute contemplates a promise to answer for another's debt; a promise for that purpose; a mere guaranty; and it never was meant that a man should set it up as a pretext to escape from the performance of a valid promise for another purpose because, in performing that, another's debt was indirectly involved." Browne, St. Frauds, § 212.

" Where a debtor transfers funds or property to another for the purpose of paying his debt, and the person thus holding the debtor's funds or property promises the creditor to pay his debt, such promise is held good, though not in writing. * * * We apprehend the true principle why the promise to the creditor is valid without writing is the same in both these classes of cases. In both the party making the promise holds the funds of the debtor for the purpose of paying his debt; and, as between him and the debtor, it is his duty to pay the debt, so that when he promises the creditor to pay it, in substance he promises to pay his own debt, and not that of another; and, though the debtor still remains liable for the debt, his real relation is rather that of a security for the party whose duty it is and who has promised to pay his debt, than of a principal for whom the other has become security or guarantor. He holds a fund in trust under a duty to pay it to the creditor. * * * The cases which decide that where a creditor holds a security for his debt, and surrenders it to a third person for his own benefit, upon his promise to be answerable for the debt, stand really upon the same substantial principle." *Fullam* v. *Adams*, 37 Vt. 397; Browne, St. Frauds, p. 259, note 1.

Hamilton accepted this arrangement. Though not a party to it, (unless the statute prevents, which it does not) on the promise to pay his debt he could sue John W. Hooper under Code 1887, c. 71, s. 2, providing : "If a covenant or promise be made for the sole benefit of a person with whom it is not made, or with whom it is made jointly with others, such person may maintain in his own name any action thereon which he might maintain in case it had been made with him only, and the consideration had moved from him to the party

making such covenant or promise." 3 Rob. Pr. (New,) 20. Had John W. Hooper failed to pay the debt, and Charles E. Hooper had paid it, he could have sued his father for damages for breach of his promise to pay.

Our attention is called to the case of *Radcliff* v. *Poundstone,* 23 W. Va. 724, which holds: "Where the consideration of a defendant's undertaking or promise is for money or property to be furnished to or received by a third person, if the transaction be such, that the third person remains responsible to the person, who furnishes him with such money or property, or from whom the consideration proceeds, such promise or undertaking is collateral and under the statute of frauds will not bind the defendant, unless in writing." But at once it is seen, that this does not fit our case. "Where the consideration of a defendant's undertaking or promise is for money or property to be furnished to or received by a third person," says that case. Here the third person is Charles E. Hooper. But in this transaction between Casteel and the Hoopers nothing was to go to Charles E. Hooper; no promise to pay him anything was made; but he paid his goods to get property conveyed to his father, to induce him to pay Hamilton's debt, such conveyance being the consideration of the father's promise. From it no principal liability was imposed on him, to which his father's promise could be collateral. His liability to Hamilton remained, it is true, but it was not born of this transaction : So this was a valid debt against the estate and properly paid by the executors.

I do not forget that Judge Johnson on page 298, 29 W. Va. (S. E. Rep. 297) not expressly mentioning this debt, but probably having it in view said: "Of course no debt of another assumed by the testator is chargeable to the estate, unless that assumption was in writing." Then there was no evidence to sustain it except Hooper's, which was incompetent. Since then Casteel's evidence has been taken. Judge Johnson did not intend this casual remark as deciding this matter.

It is argued, that Casteel is not incompetent as a witness. He is not a party to the suit. He is not one, from through or under whom Charles E. Hooper derived any interest or title by assignment or otherwise. It is said that Charles E.

Hooper is assignee of Casteel. Assignee of what? Casteel sold him a lot to be conveyed to John W. Hooper, but no title, legal or equitable, ever vested in Charles E. Hooper; for by the terms of the sale it was to go to John W. Hooper. Even if it might be said, as counsel suggests, that he sold Charles E. Hooper the lot, and he sold it to his father, that lot has been conveyed to the father and is not involved in this case. Casteel has no interest to be furthered by his evidence; and it is to prevent a living man from furthering his own interest either in his own behalf or in behalf of his alienee or assignee, where he will be prejudiced by the failure of alienee or assignee to make good his title and so come back on him, that the statute as to the evidence is intended. I do not perceive, that Casteel's connection with this matter is such as to inspire in him a motive from self-interest to favor Charles E. Hooper. It is suggested, that he is assignee of John W. Hooper. He conveyed to him a lot, but it is not involved; nor is Casteel seeking to establish a debt in his favor against John W. Hooper.

Appellants' Exception No. 10. As to $127.34 paid Hoffman; $123.33 paid Horner; $27.60 paid Dent; and $25.86 paid Forbes & Collins. Charles E. Hooper includes these items in a list of items paid by him, and in his deposition says: "Before any of the foregoing claims were paid, I examined them as carefully as I could, and believe them to be proper charges against the estate. In most of the cases I knew my father was dealing with the parties who presented the claims." His brother and co-executor says: "He was not indebted to either of them in any sense," saying no more, giving no reason, not indicating that he had any knowledge as to them. The item paid Dent is allowed in first *ex parte* settlement and is therefore *prima facie* right. It is verified by Dent's affidavit. In said settlement an item of $20.61 is allowed, not of Forbes & Collins, but Forbes, Collins & Craig. Inspecting the Forbes & Collins account, I find at one point:

| | |
|---|---|
| Balance | $25 86 |
| Board | 5 25 |
| | $20 61 |

Undoubtedly this is the same account found in *ex parte* set-

tlement, and the sum $20.61 at bottom of account is inadvertently allowed instead of $25.86. This *ex parte* settlement gives it *prima facie status*. The account of Hoffman is for sausage; that of Horner for eggs, poultry, butter and a few plums,—articles likely to be used at the Grafton House. They are all receipted as paid by executors shortly after testator's death. Under these facts they seem just; and no wrong is done to the estate by their allowance. There is no error in overruling the exception as to them.

Appellants' Exception No. 11. As to $83.85 paid for November, 1871; rent for Grafton House. Evidence shows, it was paid before testator's death, and it is to be disallowed. It was error to overrule this exception.

Appellants' exception No. 12. Twelve small charges, in all $189.38. The executors exhibit receipts for most of these items and accounts of specification. They are in the list of debts, which Charles E. Hooper says he examined and believed to be just, and knew his father dealt with the parties. There is no denial of them by the other executor. Most, if not all of them, are allowed in said *ex parte* settlement, though for different sums arising from the fact, that Commissioner Hayden allowed no items arising after testator's death, whereas the accounts contain items dating since his death, and the commissioner in *ex parte* settlement so allowed them. Even before the statute making parties competent as witnesses, small items might be allowed to executor on his own oath. 2 Lomax, Ex'rs, p. 33 § 35; 2 Rob. Pr. (Old,) 367. This exception was properly overruled.

Appellants' Exception No. 13. Stock in agricultural and mechanical society, $100.00. It was charged to executor in *ex parte* settlement. Charles E. Hooper alleges in his answer, that it was worthless, and in his deposition, that the executors " never received anything for it, and that he understood it to be worthless." There is no showing to the contrary. It is not such a *chose* as could be collected, so far as appears, by suit, nor is it shown to be salable. With respect to that part of the estate, which consists of *choses* in action, the law has long been settled, that, although debts of every description due to the testator are assets, yet the

executor or administrator is not to be charged with them, till he has received the money. 1 Williams, Ex'rs, s. p. 1509. The rule in West Virginia and Virginia is: ".An executor is not to be charged with the debts due the estate of his testator at the time when they become due, but only at the time when he actually received them, except such debts are lost by his negligence or improper conduct." *Reitz* v. *Bennett*, 6 W. Va. 417; *Evans* v. *Shroyer*, 22 W. Va. 581; *Cavendish* v. *Fleming*, 3 Mumf. 198. His account rendered under oath, is *prima facie* evidence of its truth. *Cavendish* v. *Fleming, supra.* This exception was properly overruled.

Appellants' Exception No. 14. Taxes on land. This land was devised to Sarah Hooper for life. The life-tenant must pay taxes. Tayl. Landl. & Ten. § 318. So the court held in this case. Code 1868, c. 29, s. 26 and Acts 1875, c. 54 provide: " Where the owner has devised the lands or a freehold estate therein absolutely, the assessor shall charge such land to the devisee." Mrs. Hooper's life-estate was a freehold, and she was chargeable with these taxes. Charles E. Hooper both in his answer and deposition states, that he paid taxes amounting to $593.62, and tax-bills are filed as vouchers with reports in the cause. Can Charles E. Hooper set off these taxes paid by him against the claim of Sarah Hooper as legatee? Should he have credit for them under the circumstances of this case? I think they should be charged against her. She was bound for the taxes. He had funds of hers in his hands, probably all she had, and the relation of mother and son. existed between them. The land was vested in her for life remainder in him and the other children. Is it not reasonable to say, that an understanding existed, that he should pay the taxes with money of the estate in his hands? Such payment inured to her benefit as well as the children's, he being one of them, and saved her estate as well as theirs from loss. True, one person can not, being a mere stranger, without request pay another's debt and hold him responsible. *Neely* v. *Jones*, 16 W. Va. 625. But the relation here existing was not that of mere stranger. Had Charles E. Hooper not paid, and the land been sold for the taxes, and he had bought, he being a remainder-man, probably he could not have held against her,

but he would hold the land in trust for her. It may be, that as remainder-man he would be entitled to apply money in his hands of hers to protect the remainder from loss by reason of non-payment of taxes.

But I do not place this position on these grounds. In her deposition Mrs. Hooper admits, that some taxes charged by Charles E Hooper against her as paid by him are just charges. These other taxes were charged by him under the idea, that they should be charged to the general fund whereas they were chargeable to her. She also says in her deposition : "I frequently paid Charlie money to pay taxes, but I do not know how much, or when." Thus it seems, that she knew the taxes were to be paid, recognized her obligation for them, and desired them paid, and that by the hands of her son. Is this not an implied consent, that he should pay them out of her funds in his hands ? Having funds of hers in his hands and knowing, that she wished the taxes paid, was it not reasonable, that he should consider himself authorized by her to pay them, and just to her that he should pay them ? And if she says other items of taxes were properly paid by him, why not also these ? She does not deny, that he paid them. She gives no reason, why she should not pay them, specifies no ground, why they were not binding on her equally with other taxes. She says she paid him some money to pay the taxes but does not specify how much. We think this exception because of the allowance of these taxes was properly over-ruled.

Counsel on each side interprets Judge JOHNSON'S expression as to this tax-matter as deciding it in favor of his side. I do not understand him as deciding it at all, further than that the taxes could not be charged in the account between the executors and the estate. He said : "Of course, the taxes on the real estate left to Mrs. Hooper by will are chargeable to her as life-tenant, not to the estate." He did not mean to decide either that they could or could not be set off as between the executors and Mrs. Hooper. If he did decide it, it was that she should be charged with them. Counsel contends that no amount of evidence would make these taxes a set-off in favor of the executor, because they are sued as executors, and this is a demand against Mrs.

Hooper individually, and thus the claims are not in the same right; citing 5 Rob. Pr. 976, and 2 Lomax, Ex'rs, 417. The latter lays down the rule thus: "A defendant, sued as executor or administrator, can not set off a debt due to him personally; nor, if sued for his own debt, can he set off what is due to him as administrator, because debts sued for and intended to be set off must be mutual and due in same right."

These principles refer to cases, where representatives are sued merely as such in their representative capacity for a demand against the estate, where they can not set off debts due to them individually; or where they sue for a debt due the estate, where their individual debts can not be set off. Not so here. Here the executors are sued, because they were executors for a fund in their hands due to legatees. It is not against the estate, but is a personal demand against the executors. 2 Lomax, Ex'rs, s. p. 400. The authorities cited relate to suits at law, not suits brought by legatees against executors for recovery of legacies, where the accounts between the parties are always adjusted. I see no reason, why in such a suit by a distributee or legatee for his share a debt due from him to the personal representative may not be set off. "Money lent and goods delivered by the executor to the legatee, it has been held, might be insisted on by the executor on a bill filed to recover from him the legacy as part payment." Id. 490. Moreover, it might not be going too far to say that under the circumstances such taxes should be treated not as offsets but as payments by the implied understanding of the parties.

Appellants' Exception No. 15. I do not think it reasonable to charge Charles E. Hooper with $600.00 family board at the Revere House, as being contemplated by the parties, as his presence there was indispensable to the business, and he was giving his personal service, for which he could not charge, while his father did not give such service. Such would not be the case with any firm-funds used by him in paying services of a nurse or used for his family expenses. They would be chargeable to him on a settlement of the partnership account. But it would be a debt due the firm, and for reasons given above would be included in the partnership-balance. 7 Amer. & Eng. Cyclop. Law, tit. "Executors," XI. par. 6, p. 210, and note 5.

Appellees' Exception No. 1. Illinois lands. On the former appeal this Court adjudicated this question holding, that it should be charged to the executors. There was no error in overruling this exception.

Appellees' Exception No. 2. Items $5.00 paid Casteel, $100.14 to Simpson, Boyd & Co., $28.00 to Trahern, $3.95 to G. E. Jarvis, were allowed to executors in first *ex parte* settlement, and are therefore correct *prima facie* and have not been overthrown. Receipts for the first two are shown, and Charles E. Hooper swears to them in his deposition. S. Warfield item of $141.54 is also allowed in said settlement. The account shows that $134.29 of it was prior to testator's death. I do not construe Charles E. Hooper's answer as admitting, that it was after said testator's death, as suggested by counsel. He says: "If the following accounts [this being one] named in said bill were contracted before." The items of $8.00 paid Shutt & Son for funeral expenses, $40.00 to Miller for gas, and $4.17 to John A. Cole, are sustained by evidence of Charles E. Hooper and are such charges as are probably correct. The said items of $5.00, $100.14, $28.00, $134.29, $8.00, $40.00, $3.95, and $4.17 should be credited to executors; and the court erred in wholly overruling them. The Simpson, Boyd & Co. item of $108.10 should not be allowed. It was not in the *ex parte* settlement. There is no proof of it; and the account shows, that it comes from two items of $46.80, dated December 13, 1871, and $61.30, dated December 22, 1871,—both after testator's death. I see nothing to justify the allowance of $63.00 paid to John M. Rogers. It was error to wholly overrule this exception.

Appellees' Exception No. 3. This exception was sustained as to $30.10, goods bought at sale by Mrs. Hooper, and executors were allowed that. She received the benefit of these items. They were such as she needed on the farm and are probably correct and are sustained by Charles E. Hooper's deposition. The other items, as will appear from Statements C and 9, were allowed to executors except $56.25 insurance. Statement 9 gives executors credit for these items except insurance after crediting Mrs. Hooper with $180.00 collected from Doll. I see nothing to justify charging $56.25 insurance to Mrs. Hooper. She did not authorize the pay-

ment. The court did not err in overruling Exception No. 3 as to that item. It allowed executors the other items, though their counsel do not so understand it.

Appellees' Exception No. 4. I do not think the evidence justifies the charge of $400.68 to Harry B. Hooper, and there was no error in overruling this exception.

Appellees' Exception No. 5, as to $2,544.50 in Martinsburg bank. William S. Hooper says it was all checked out by Charles E. Hooper, but the checks on that bank were signed by both of them, and I do not see, that to their extent the money was chargeable solely to Charles E. Hooper. The report seems erroneous as to this. But as yet there has been no decree as between the executors. Nothing has yet been decreed to William S. Hooper's assignee, Whitescarver, or to Charles E. Hooper. Legatees must be paid as against both of them, before they can get anything, no matter which received the assets, as one is surety for the other. *Hooper* v. *Hooper*, 29 W. Va. 277 (1 S. E. Rep. 280). This matter is not important, and may never be.

Appellees' Additional Exceptions, marked "N." Exceptions Nos. 1 and 2. Properly overruled. There is no evidence to charge Mrs. Hooper with any part of the $1,508.18 unsold property at the Grafton House. The preponderance of evidence is against any agreement between her and her sons to continue business there at least of such character as to charge her with waste of the property.

Appellees' Exception, No. 4. Properly overruled, as report charges William S. Hooper with $725.00.

Exception No. 5. There should have been a stated account between the executors for purposes of a decree as between them.

George M. Whitescarver excepted because the commissioner did not report him as assignee of W. S. Hooper entitled to the same amount as reported in favor of Harry B. Hooper. This exception is not well taken. William S. Hooper as an obligor in the bond is a surety, and he or his assignee can not get anything, until other legatees are paid in full. Harry B. Hooper was not on the bond. But the court never acted on this exception nor rendered any decree as to the rights of Whitescarver.

. The decree is to be reversed with costs, and cause reman-
ded for further proceedings in accordance with principles
herein indicated, and further according to principles govern-
ing courts of equity.

REVERSED.  REMANDED.