First Baptist Church of Hoboken v. Syms.

FIRST BAPTIST CHURCH OF HOBOKEN, in the township of
North Bergen, county of Hudson, New Jersey,

*v.*

PARKER SYMS, individually and as executor of the will of
Samuel R. Syms, deceased, ROBERT H. SYMS and others.

1. If legacies be given generally and the residue of the real and personal
estate be afterwards given in one mass, the legacies are a charge on the residuary real as well as personal estate.

2. A judgment against an executor is conclusive upon legatees so far as the personalty which comes to the executor is concerned, but is not conclusive upon them so far as their legacies are charged upon and payable out of realty.

. 3. A court of equity may restrain an executor from prosecuting proceedings to sell lands for the payment of claims he knows to be fictitious or without merit.

4. While a court of equity cannot sit in judgment upon the lawful acts of other tribunals, and review the conduct of those tribunals to see whether, in the exercise of their rightful powers, they have committed error either in law or in fact, its power to give relief against a judgment which has been procured by fraud or imposition upon another court, is beyond all question.

5. Proof that evidences which would go to prevent the recovery of judgment were collusively withheld from the court by the parties to a suit, is not alone sufficient to establish fraud or imposition. It must also clearly appear that the judgment thus recovered was, in fact, unjust.

6. An action for money had and received will not lie unless privity of contract, express or implied, exists between the parties to the suit.

Final hearing upon bill, answer, replication and proofs.

*Mr. Gilbert Collins*, for the complainant.

*Mr. John Garrick*, for Robert H. Syms.

*Mr. William Brinkerhoff*, for Parker Syms.

THE CHANCELLOR.

Samuel R. Syms died at his residence in West Hoboken, in
this state, in November, 1891, leaving a will which bears date

one month before his death, in and by which he first directed that his debts be paid, and then gave to his wife his household furniture and personal effects, and to certain nieces, nephews and cousins, pecuniary legacies aggregating in amount $10,000. Then he bequeathed eighty shares of the capital stock of the First National Bank of Hoboken to the cashier of that bank, in trust for specified objects, and then gave to the complainant a pecuniary legacy of $5,000, after which he made disposition of "all the rest, residue and remainder" of his "property, real, personal or mixed," to his executors in trust, to take the income therefrom and distribute it during his widow's life, as the will directs. At the expiration of the trust, the principal thereof is to be distributed as the will provides.

The testator's sons, Parker and Robert H., were appointed the executors and his wife the executrix, of the will. Subsequently, the will was admitted to probate, and Robert H. Syms and the testator's widow renounced the executorship, and Parker Syms alone assumed the duties thereof. In March, 1892, the executor filed an inventory and appraisement of the personal estate of his father, by which it was made to appear that that estate was worth $25,394.86. In May, 1892, the testator's widow filed her dissent to take the property which the will gave to her in lieu of dower.

On the 27th of January, 1893, the executor, by his petition, represented to the orphans court of Hudson county that the personal estate of Samuel R. Syms was insufficient to pay his debts, and that he died seized of lands, particularly described in the petition, valued in the aggregate at $106,000, all of which lands, except a tract in Morris county, worth about $25,000, are situate in the county of Hudson, and prayed that the lands in Hudson county should be sold to pay debts. With his petition he exhibited, under oath, an account of the debts and personal estate of the testator, in which account the personal estate was shown to be valued at $37,954.63, the same having been increased by receipts, subsequent to the inventory and appraisement before mentioned, and the debts of the testator aggregated $105,486.54, in addition to mortgaged liens upon the real estate,

which amounted to $36,000. Thus it was made to appear that more than $60,000 in value of the real estate would be required to satisfy the debts, exclusive of the mortgage liens.

Among the debts included in the account thus presented is one in shape of a judgment in the supreme court of this state, against the executor and in favor of his brother, Robert H. Syms, for $58,561.25, which judgment the complainant now attacks as collusive and fraudulent. The executor has been restrained, by order of this court, from continuing the proceedings for the sale of lands until further order herein, and, under such restraint, the proceedings in the orphans court have been suspended.

The valuation of the real and personal estate, as shown by the executor's account in his application to the orphans court, is not disputed, and it is observed, if that valuation be correct and the claims presented to the receiver are valid subsisting debts, that the complainant will not be paid anything for its legacy, even though that legacy be held to be charged upon the testator's entire estate, real as well as personal. If it should be held not to be charged upon the realty, it is apparent that it can take nothing, even though its attack upon the judgment of Robert H. Syms be entirely successful, because, without that judgment, the remaining indebtedness is sufficient to absorb the entire personal estate; consequently, in such case, an attack upon the judgment would not advantage the complainant, and its standing in this court, to maintain a litigation which could not by possibility benefit it, may well be questioned.

The first relevant inquiry, then, is whether the legacy to the complainant is a charge upon the entire estate. The rule laid down in *Hawk. Wills 294,* that if legacies be given generally and the *residue* of the real and personal estate be afterwards given in one mass, the legacies are a charge on the residuary real as well as personal estate, is adopted by the courts of this state. *Stevens* v. *Flower, 1 Dick. Ch. Rep. 340,* where the cases in this state are collected and commented upon. The reasoning upon which the rule rests is that the real and personal estate, by such gift, is treated by the testator as one mass, part of which is

First Baptist Church of Hoboken *v.* Syms.

represented by the legacies, and what is given after the legacies are paid is given *minus* that which has been before given, and is therefore given subject to the prior gift, and is chargeable therewith.

I think that this rule is applicable in the present case and that the complainant's legacy is chargeable upon the real as well as personal estate of the testator.

This being so, the serious injury which the complainant will suffer from the continuance of a fraudulent and collusive judgment against the executor is manifested, not, perhaps (in absence of irresponsibility of the executor), in the mere fact of the payment of such a claim by him out of the proceeds of the sale of such real estate, for the propriety of such a payment may be questioned upon his accounting, but in the necessity it occasions for the submission of the real estate to a forced and perhaps a sacrificial sale to unnecessarily raise a large sum of money.

It is held by the prerogative court, in *Smith* v. *Smith's Administrator, 12 C. E. Gr. 445*, that in an application for an order to sell lands for the payment of debts, the orphans court is not invested with power to determine the validity of the claims of creditors, but that its inquiry is limited to the ascertainment of the truth of the executor's statement in his application, including the enumeration of claims which have actually been presented to him and their respective amounts.

The attack upon the judgment, of Robert H. Syms, questions the greater part of the claim upon which it is based, as fictitious and groundless, and asserts that the judgment itself was procured in a collusive suit between the executor and his brother, by the fraudulent withholding of facts and evidence from the court in which it was recovered, which, appearing, would clearly have demonstrated that more than nine-tenths of the claim upon which the judgment was founded was a mere pretence.

Part of the claim underlying the judgment is not disputed, and for that part the executor's statement should stand.

Another consideration is this: If the judgment is ultimately allowed to stand and be enforced, it will be conclusive upon the executor and also upon the legatees under the will, who are the

executor's privies so far as the personalty coming to him, the primary fund for the payment of debts and legacies, is concerned (*Castellaw* v. *Guilmartin, 54 Ga. 299 ; Redmond* v. *Coffin, 2 Dev. (N. C.) Eq. 437 ; Hooper* v. *Hooper, 32 W. Va. 526*), and the entire personal estate may at once be applied to its payment, to the complete exhaustion of the personalty, leaving yet unpaid a portion of the judgment and the entire amount of the indisputable debts, the payment of which will be thrown upon the real estate.

The judgment against the executor is not conclusive upon the heirs and devisees, who are not in privity with him (*Birely* v. *Staley, 5 Gill & J. 432, 453 ; Collinson* v. *Owens, 6 Gill & J. 4 ; McCoy* v. *Nichols, 4 How. (Miss.) 31, 39 ; Beckett* v. *Selover, 7 Cal. 215 ; Stone* v. *Wood, 16 Ill. 177, 179 ; Robertson* v. *Wright, 17 Gratt. 534*), because they do not claim under him and are not parties to the suit, and are not in position to adduce evidence in opposition to recovery, controvert the testimony offered in support of the plaintiff's case or appeal from the judgment when rendered, and, for the same reason, it is not conclusive upon the legatees so far as their legacies are charged upon and payable out of the realty ; and when, therefore, the executor seeks the realty for the payment of that judgment, those who are entitled to interest in the real estate are not bound by the judgment, but may question the claim which underlies it and is its foundation. It thus appearing that the judgment is conclusive upon the legatees as to the personalty, and is not conclusive as to realty, it would seem to follow that, if it stands and may be used as a shield to the executor, it will protect him in applying at least the personalty in its payment and estop the legatees from questioning such application, and their right of ultimate contest will be limited to the remnant of it which comes over upon the realty unpaid.

Yet another consideration : The proceeding to sell land for the payment of debts is a statutory substitute for an action against the heir, devisee or legatee whose legacy is charged upon the realty. But the prerogative court holds that in it a debt actually claimed cannot be contested. Surely, the persons inter-

ested in the land should not be obliged to submit to the sale, and thereby, perhaps, sacrifice of their property to make an amount sufficient to pay such invalid claims as the executor may be pleased to report, merely because the orphans court, in which the proceeding is conducted, has not power to investigate the merits of the claims. Such a condition of affairs exhibits a strong necessity for the interposition of equity when it shall clearly appear that the proceeding is unjustly conducted to injure and defraud the applicant for its assistance.

The substantial reasons, then, for an attack upon the judgment at this time are—*first*, to preserve the personalty for the payment of just debts and, to the extent of the unjust portion of the claim underlying the judgment, exonerate the real estate from the charge of those debts; and, *second*, to reduce the amount of money to be made out of the real estate.

This court cannot sit in judgment upon the lawful acts of other courts and review the conduct of those tribunals, to see whether, in the exercise of their rightful powers, they have committed error either in law or in fact, but its power to give relief against a judgment which has been procured by fraud or imposition upon another court, is beyond all question. *Glover* v. *Hedges, Sax. 119; Boulton* v. *Scott's Administrator, 2 Green Ch. 236; Tomkins* v. *Tomkins, 3 Stock. 512; Reeves* v. *Cooper, 1 Beas. 223; S. C., 1 Beas. 498; Stratton* v. *Allen, 1 C. E. Gr. 229; Doughty* v. *Doughty, 12 C. E. Gr. 315; S. C., 1 Stew. Eq. 581; Cairo and Fulton Railroad Co.* v. *Titus, 1 Stew. Eq. 269; Mechanics' National Bank* v. *Burnett Manufacturing Co., 6 Stew. Eq. 486; Cutter* v. *Kline, 8 Stew. Eq. 534; Herbert* v. *Herbert, 4 Dick. Ch. Rep. 70; S. C., 4 Dick. Ch. Rep. 566.* It deals with the consciences of the parties to a judgment, and will inquire whether those parties, or either of them, have intentionally withheld or concealed from the court in which the judgment was rendered, any fact which, if disclosed, would have shown that there was either no cause of action or no warrant for the amount of the recovery. *Doughty* v. *Doughty, supra; Cairo and Fulton Railroad Co.* v. *Titus, supra.*

In the present case the charge is that both parties to the judg-

ment colluded to so control the proceedings in the law court and conceal from that court pertinent facts as to procure an unjust judgment, which could be used, in effect, to defeat the will of Samuel R. Syms, and, incidentally, the payment of the complainant's legacy.

It appears that William J. Syms, of the city of New York, died testate on the 2d of April, 1889, leaving a large estate. He had no children. By his will he bequeathed to each of his brothers, Samuel R. Syms and John G. Syms, and to his sister, Mary E. Serrell, a legacy of $50,000, and, after making sundry other legacies, among which was one of $10,000 to his nephew, Parker Syms, the son of his brother Samuel R., he disposed of the residue of his estate to his widow, Catharine E. Syms. His widow, his brother Samuel R., Dr. McBurney and Mr. Henry C. Tucker were respectively appointed executrix and executors of the will.

The will was admitted to probate by the surrogate of the city and county of New York on the 22d of April, 1889, and the nominated executors and executrix qualified and assumed the burden of the administration of the estate.

It appears that Parker and Robert Syms, the sons of the executor Samuel R. Syms, shortly after the probate, determined to contest the will, and, because they were not heirs-at-law or next of kin to their uncle, sought the co-operation of their father and their other uncle, John G. Syms, and their aunt, Mary E. Serrell. Their father, after some consideration and conference with counsel, refused to take part in the contest because of his executorship, and their uncle, John G. Syms, did not enter it because he had been paid a portion of his fifty-thousand-dollar legacy, which he was unable to return. Mrs. Serrell hesitated for a time, but finally, upon the urgent solicitation of her nephews, Parker and Robert Syms, consented to become the contestant. She insists that it was understood that the contest was to be made for the benefit of her brothers and herself, and that she and they were to share equally in whatever profit should result from it, and, in case of an unsuccessful and fruitless litigation, were to equally bear the losses; that her brothers were not to appear personally

24

in any agreements or negotiations, but were each to be represented by a son; that at first it was understood that Parker Syms should represent his father, but afterwards Robert was substituted for Parker because the latter, who is a physician, was associated professionally with the executor Dr. McBurney, and his active participation in a suit against the will might be resented by Dr. McBurney in such a way as to disturb their amicable relations; besides, as has been noted, he was a legatee of the will to be attacked. In behalf of John G. Syms, his son George N. was to act. As will presently appear, the defendants deny the truth of this insistment, taking the ground that Robert Syms acted for himself and not for his father.

The contest was commenced late in April, 1890, and on the 7th of May Mrs. Serrell and her nephews Robert and George entered into an agreement in writing with one Bomeisler, a lawyer of the city of New York, by which Mr. Bomeisler was entrusted with the management of the litigation for a fee contingent upon its success and the amount of recovery. In this agreement Mrs. Serrell and her nephews were parties, apparently in their own right, and, by recital, Mr. Bomeisler was styled "their" attorney. About the same time a paper was presented to Mrs. Serrell by either Parker or Robert Syms for her signature, whereby she was to bind herself, among other things, to share the profits of the contest with her nephews, Robert H. and George N. Syms. This paper Mrs. Serrell refused to sign, because, she says, she had verbally promised to divide the profits with her brothers and was unwilling to renew that promise in writing or to sign any paper which would apparently recognize the brothers' sons as entitled in their fathers' stead.

Very soon after the agreement with Mr. Bomeisler was signed, negotiations were had for a settlement of the contest, which, early in June, resulted in a compromise, whereby, upon the payment of $175,000 to Mrs. Serrell, the litigation was discontinued, and, to effectuate the compromise, general releases were given by Mrs. Serrell and also her brothers Samuel R. and John G., not only to the residuary legatee and devisee of William J. Syms, but

also to the estate of William J. Syms and the executors of his will.

Prior to the 7th of June the $175,000 was paid to Mrs. Serrell, and, after she had disbursed therefrom $27,262 for the expenses of the litigation, she divided the remaining $147,738 between her brothers and herself, to each $49,246. At the time of payment, because she feared that by her contest she had incurred the displeasure and resentment of Catharine E. Syms, she exacted an agreement with her brothers, which Samuel drew with his own hand, whereby, to use the language of that document,

"in consideration of the division of money obtained by said Mary E. Serrell in compromise of the contest of the will of their brother W. J. Syms and of other valuable consideration," they agreed "that in case Mrs. Catharine Syms, widow of their late brother W. J. Syms, should give by will or otherwise to either of the parties hereto any sums of money or property, at any time, that they will share the same equally with each other, the intent being that the parties hereto shall be equally benefited by any gifts from her or proceeds from her estate."

Samuel R. Syms was then pecuniarily embarrassed by pressing obligations, among which was an indebtedness of $30,000 to his sister, Mrs. Serrell, and in urgent need of money. When Mrs. Serrell paid him a share of the profits of the compromise she made the payment by giving him the difference between the $49,246 and his indebtedness to her, and canceled that indebtedness.

She testifies that when she promised to pay her brother Samuel one-third of the amount to be realized from the contest, he had declared that he would not assist in the litigation, but, as executor, would, on the contrary, resist it; also that he did not claim a right in any portion of the moneys that might be realized through the contest, but at the same time he said that his sister could do as she pleased in paying part of those moneys, and if she should pay him anything such payment would be her free gift. She says that it was with the understanding that she was to pay him one-third of the net proceeds that she went into the contest.

Both Parker and Robert Syms deny that it was understood as Mrs. Serrell claims, and in Robert's behalf they assert that after

their father and Uncle John had refused to become parties to the
contest, their aunt expressed a willingness to go into the contest
for the benefit of herself and all her nephews and nieces, and
afterwards agreed to go into it with Robert and George individu-
ally and not as representatives of others.    They also testify that
before Mrs. Serrell paid their father, Robert requested the father
to go to his aunt and get the money, and, to properly equip him
for his errand, gave him a written demand upon Mrs. Serrell for
it.   It does not appear that such a demand was delivered to Mrs.
Serrell, and, although she was not called upon to deny its receipt,
I think that a declaration of Robert, made some time after the
payment, that she had "nothing to show" to protect her against
a suit by him for the money, to which I shall refer in another
connection, sufficiently establishes that it was not delivered to her.
Upon hearing of some similar declaration to that which has just
been stated, Mrs. Serrell demanded that her nephews Robert and
George execute a release to her, a draft of which she had pre-
pared and sent to each of them.    That release was as follows :

"BAYONNE, July 1st, 1890.

"We, the undersigned, having entered with our aunt Mrs. Mary E. Serrell,
into an agreement with Louis Edwin Bomeisler whereby said Bomeisler was
to act as our attorney of record in the contest of the will of William J. Syms
and in which agreement we bind ourselves to pay the said Bomeisler certain
sums of money contingent on a successful result of the contest or of a com-
promise, and as the aforesaid contest resulted in a compromise, and as our
aunt Mary E. Serrell has paid said Bomeisler in full, and also paid all other
disbursements as was agreed upon and made such other division of the pro-
ceeds of the said compromise as agreed upon.

"Now therefore, we the undersigned, do, for ourselves, our heirs, executors
and assigns, forever release our aunt Mary E. Serrell from all obligation in
this matter."

George signed the release as it was prepared, but, before Robert
signed it, he had a conversation with his father as is hereafter
stated, and then changing the words "as agreed upon," follow-
ing the word "compromise," at the end of the first paragraph,
to the words "as was satisfactory," executed the paper.

Mrs. Serrell is corroborated in important particulars, which
tend to show the truth of her insistment, by her two sons and

the wife of one of them, and also by her brother John and his son George, both of whom, in substance, testify that their understanding was that Robert and George appeared merely as the representatives of their fathers.

The testimony very clearly exhibits that during the entire suit Parker and Robert Syms worked together and were alike cognizant of the understanding with their aunt, as they were of every fact in the proceedings of which the above narrative is given.

The claim upon which the disputed judgment is founded is made up of the $49,246 paid by Mrs. Serrell to Samuel R. Syms, with interest thereon, and items, not now disputed, amounting to less than $4,000.

The executor, Parker Syms, plead the general issue to his brother's declaration, and the case, instead of being tried in open court by a jury, was sent to a referee, before whom six witnesses were produced—the plaintiff, his mother, his two sisters, his brother-in-law and Mr. Bomeisler. No witnesses were produced in behalf of the defendant. The defendant appeared by counsel before the referee, and that counsel cross-examined the plaintiff's witnesses in such a manner that it is impossible to read the cross-examination without an abiding conviction that it was intended to aid the plaintiff's case rather than to defend against it and defeat it.

Of all the documents referred to in the statement of facts above given, only the agreement with Mr. Bomeisler respecting his contingent fee was put in evidence. In that agreement it is remembered Mrs. Serrell and her nephews styled Bomeisler as "their" attorney. The proposed agreement by Mrs. Serrell to share the profits of the litigation with her nephews instead of their fathers, which Mrs. Serrell refused to sign, was not referred to. Neither the release by Samuel R. Syms and his brother John to the estate of William J. Syms and his residuary legatee, Catharine E. Syms, nor the agreement between Mrs. Serrell and her brothers, to share any proceeds or gifts from Catharine E. Syms or her estate, nor the release of Robert and George Syms to Mrs. Serrell, was produced. The plaintiff testified, as an excuse for the non-production of Mrs. Serrell as a witness, that she was then ill and

absent from home, and that excuse was suffered to account for her absence, no application being made to continue the case until her attendance could be had.    Neither she, nor her sons, nor her daughter-in-law, nor John G. Syms, nor George N. Syms, were produced by the executor, although the case abundantly discloses that they were known by him to be most material witnesses in his behalf.    Although the executor was sued in a representative capacity, he made no objection to the plaintiff being sworn in his own behalf and testifying both to conversations and transactions with his decedent.    Indeed, it is difficult to see how the case could have been more carefully managed to support the plaintiff's claim and exclude from the court's consideration the insistment of Mrs. Serrell that she agreed to give the $49,246 to her brother Samuel, and did fulfill her promise, and that she always persistently refused to recognize any right in Robert to share in any portion of the compromise.    Coupled with these *indicia* of collusion should also be mentioned the significant facts that Robert Syms, as though anticipating the recovery of a judgment, failed to qualify as executor of his father's estate, and his mother, as though anticipating the exhaustion of the estate by the debts, dissented to the acceptance of the provisions of her husband's will in lieu of dower, which are urged as indicative of a pre-concerted design.

If it were within the power of this court to afford the complainant relief against the judgment upon the establishment merely of collusion between the parties to it, in pursuance of which important evidences were intentionally withheld from the law court, particularly where that collusion is coupled with the fact that the defendant in the judgment occupies a position of trust and confidence, as executor of his father's will, to each of the legatees thereunder, which demands from him the exercise of a more scrupulous fidelity than such collusion admits of, I could have little hesitation in granting it relief.    But this court's jurisdiction obtains in such a case as this only upon the establishment of fraud, and to establish that the proofs must show not only collusion and the intentional concealment of evidences, but also that the evidences withheld, if they had been presented

to the law court, would clearly have been sufficient to defeat the plaintiff's suit.  In other words, it must clearly appear that the collusive acts have done injury to the complainant.  It is not enough that they create doubt as to the validity of the claim and present a contestable case.  *Herbert* v. *Herbert* (on appeal), *supra*.

This brings me to the consideration of the defendants' proofs touching the merits of Robert's claim.

At the point in her testimony where Mrs. Serrell asserts that she refused to agree to divide the proceeds of the compromise with her nephews, she is corroborated by her children and directly contradicted by her nephews Robert and Parker and by Mr. Bomeisler.  Besides that contradiction, the defendants testify that Samuel R. Syms went to his sister as the agent of his son Robert, armed with that son's written demand for the money, and, after being paid, acknowledged to that son that he had received the son's money, and thereafter followed that acknowledgment by repeated avowals that the money he had received from his sister belonged to Robert.  Parker Syms, corroborated by Robert, testifies that he and Robert were at their father's house when the father returned from Mrs. Serrell's, and that Robert, addressing the father, said, " Did you get *my* money ? " to which the father replied, " Of course I did ; I got every cent of it, as I told you I would," and then proceeded to explain that the payment was not all made in cash.

The testimony as to the declarations which followed this admission by Mr. Syms is this : Mrs. Siedler, a sister of Robert, states that the night before her father was stricken with apoplexy, from which he died, he discussed an attack that his co-executors of his brother's will were making upon him for complicity in the contest of that will, and said : " I am prepared to go into any court of law and prove that I have never derived any benefits and received any moneys under that suit whatever." Of the same discussion, the husband of this witness testified respecting Mr. Syms' declaration as follows :

" He said that he was sure to beat them in this contest ; he was sure to vindicate himself; that they could not, by any possibility, show that he had any parcel or participation in the suit brought by Mrs. Serrell or the revocation

of the probate of the will of W. J. Syms; that he had received no part of the money; that if they pointed to any money that had been paid to him by Mrs. Serrell, he could satisfactorily prove that that was not his money; *that was Rob's money;* that he got that money from Mrs. Serrell *on Rob's order;* that it was not his money at all " &c.

Another witness testified that, upon an occasion some time after the compromise, at the seashore, Robert said to his father that Mrs. Serrell had paid the father, by his (Robert's) authority, but that she had nothing to show for her payment, and consequently he could sue her and make her pay the money over again, and then asserted that if he should send his aunt the release which she had demanded from him, he could hold his father accountable for the money which the aunt had paid, and his father, after deliberating, said, " Yes, that is so."

A real estate agent testified that, in conversation with Samuel R. Syms about some mortgages, Mr. Syms remarked that he had received $100,000 from his brother's estate, part of which belonged to one of his sons.

Two witnesses speak of a time when Robert thought of using some of the money paid to his father by Mrs. Serrell in a mining venture, and say that, while Mr. Syms strongly advised against such use of the money, he, at the same time, admitted that his son had the right to it.

Mrs. Syms, Robert's mother, testified that her husband frequently spoke of Mrs. Serrell's payment to him as Robert's money.

To still further sustain their position by discrediting Mrs. Serrell's testimony, the defendants produce an affidavit made by their aunt early in 1892, after her brother's death. It appears that the affidavit was solicited by Parker Syms, to enable him, as executor of the father's estate, to secure the father's commissions as executor of W. J. Syms' will, and that it was represented to Mr. Serrell that such an affidavit was needed not only to secure the commissions, but also to protect her brother's memory by refuting the charge that he had been unfaithful to his trust by complicity in an attack upon the will he had sworn to execute. The affidavit was prepared and sent to her to subscribe

First Baptist Church of Hoboken *v.* Syms.

and swear to. Among other things, it stated that she and George N. and Robert H. Syms had agreed to share equally in the expenses and profits of the will contest, and that, pursuant to the agreement, she had paid $49,246, the share of Robert, to Robert's father, by Robert's consent and direction. To these facts she swore. The affidavit also contained the further statement that the payment to Samuel was in trust for Robert, and that Samuel did not in any manner aid or abet the will contest and did not receive any part of the money in pursuance of an agreement by which it was to be paid to him, and was not at all financially interested in the contest. These statements she struck out of the affidavit. That which she swore to certainly conveyed the impression that Robert had agreed with her independently of his father and in his own right, and that the money paid to the father was paid in obedience to Robert's order and consent, and it is inconsistent with the testimony she has given in this suit. Although its consideration in connection with that part of the proposed affidavit which she rejected and the evidence in this suit suggests that it was perhaps meant to be misleading, it must necessarily, even when regarded in that aspect, in a great degree, destroy the confidence with which Mrs. Serrell's testimony might otherwise be accepted. I think that it is but just that I should here refer to the following circumstances, which appear to me to strongly point to the present attitude of Mrs. Serrell as sincere:

Immediately after the compromise of the will contest, Mrs. Serrell made Parker and Robert a present of $20, which Parker acknowledged by a letter dated June 21st, 1890, in this language:

"I quite agree with you that we should be mutually thankful and congratulate ourselves on the success of the legal affair. I am very glad it is over and that it reached so satisfactory an end, for it was certainly like getting that amount out of the fire. Father sent me a check from you for $20 for Robert and myself. Many thanks, it will cover our expenses in the matter."

And the following Christmas she made each of them another present, which evoked from their mother a letter containing these expressions:

"It was especially generous of you to give Parker and Robert such an expression of your appreciation. We all gratefully recognize the fact of all we owe you in the great comfort we enjoy, and that you, surely are not the one to need express an obligation, since while the boys worked earnestly and very hard, yet all their efforts would not have availed at all without you. None of our family forget all the comfort and especially the relief from care and anxiety you have so brought to your brother and his family in which I am glad the boys could aid to a degree."

It is pertinent to ask whether Mrs. Serrell would have been thus grateful to her nephew Robert if she had known that by his work he had gained nearly $50,000.

Amidst the conflicting evidences, it is difficult to determine precisely what merit the claim upon which the judgment is founded, has. It is a question of the credibility of witnesses, and disputable whether or not Mrs. Serrell agreed to divide the profits of the will compromise with her nephews Robert and George. And beyond this question, if it be resolved in the affirmative, is the important inquiry as to the capacity in which Samuel R. Syms took the money. Did he take it for himself or as the agent of Robert? If he took it in his own right, then there was no privity of contract between him and his son, and even though the money was rightly the property of the son, the son was without cause of action at law. But, whatever may have been the intention and belief of Mrs. Serrell when the payment was made, if the money rightfully belonged to Robert, and Samuel recognized the right of his son to it, and, as his agent, received the payment thereof, the son would be entitled to subsequently recover it from him or his estate. *Sergeant* v. *Stryker, 1 Harr. 464; Nolan* v. *Manton, 17 Vr. 231; Wescott* v. *Sharp, 21 Vr. 392.* It is upon this inquiry that the testimony as to the written demand of Robert and the declarations of Samuel R. Syms pertinently bear. After a careful scrutiny of this testimony, I reach the conclusion—which is sufficient for purposes of this case—that if the testimony does not sustain Robert's claim, it at least fails to demonstrate that it is without validity.

Because of the collusive appearance of the judgment, the suspicious environments of its recovery and the trust relation between the complainant and executor, I would be glad to so

control it that its merits might be considered by a jury, but, as I understand the decision of the court of errors and appeals in *Herbert* v. *Herbert*, such a disposition in this case is not within my power.    I therefore will dismiss the complainant's bill.